**PITCHFORD SCIENTIFIC INSTRUMENTS CORPORATION, Plaintiff,**

v.

**PEPI, INC., North American Philips Corp., and Philips Electronic Instruments, Inc., Defendants.**

**Civ. A. No. 70–1461.**

United States District Court,
W. D. Pennsylvania.

Nov. 23, 1977.

the Court of Claims or by a proceeding in the Tax Court."

Gregory A. Pearson, Clayton A. Sweeney, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for plaintiff.

Paul H. Titus, Pittsburgh, Pa., for defendants.

## OPINION

DUMBAULD, District Judge.

The instant proceeding is for the purpose of fixing the counsel fees which plaintiff is entitled to recover in a successful[1] private antitrust case.[2] 15 U.S.C. § 15 provides that:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Although the case at bar was not a class action (where there is always suspicion that no one but counsel benefits substantially from the fund created by the almost inevitable settlement[3]) the criteria set forth in *Lindy Bros. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 166–69 (C.A.3, 1973), 540 F.2d 102, 116–18 (C.A.3, 1976), constitute the appropriate measuring rod for determining a reasonable fee.

■ Stated succinctly, those criteria prescribe a basic time charge (sometimes called "lodestar"), adjusted for the factor of contingency and any unusual quality of work performed.[4]

Plaintiff's application and two affidavits set forth time and other details, purporting to comply with *Lindy* requirements, and seek an award of $567,314.30 (double the basic time charge or "lodestar" of $283,-657.15[5]) plus expenses of $50,841.64. Defendants, in brief and oral argument, have accepted the time record as authentic, but contest the hourly rates used and contend that certain items are improper to be included. We shall therefore take plaintiff's calculations as the starting point, and subtract any amounts found to be excessive upon consideration of the points raised by defendants.

■ We note at the outset that defendants often argue that certain items might be proper in a contractually agreed upon fee with a client, but should not be collected from defendants who are required to pay by virtue of statutory compulsion. It is of course true that the fee prescribed by 15 U.S.C. § 15 is imposed *in invitum* upon losing defendants. But the statute calls for a *reasonable* fee, not a bargain-basement figure. As with railroad rates, there is a "zone of reasonableness," implying a reasonable minimum as well as a reasonable maximum.[6]

■ The prevailing party in a private antitrust case is entitled to a fair fee covering all services which competent counsel would reasonably deem appropriate. The fact that defendants' counsel (if representing plaintiff) might have thought it safe to cut corners does not mean that plaintiff's counsel should not be compensated for work

1. Plaintiff recovered a verdict of $312,349.00, which tripled is $934,047.00.

2. For prior proceedings in the case at bar see 531 F.2d 92 (C.A.3, 1976), and 435 F.2d 685 (W.D.Pa.1977).

3. See 540 F.2d at 126, n. 20. See also Francis R. Kirkham, "Complex Civil Litigation," address at the Pound Conference, 70 F.R.D. 139, at 205–207.

4. In evaluating quality the court should consider the complexity and novelty of the issues, the excellence of trial work observed, and the

amount of the recovery obtained. 487 F.2d at 168. With respect to both contingency and quality factors, the court should identify, quantify, and justify any deviations from the basic time charge. 540 F.2d at 118.

5. Application, p. 9. Plaintiff's brief, p. 5 gives the basic figure as $289,557.65, but half of $567,314.30 is $283,657.15. Addition of the separate items also yields $283,657.15.

6. *U. S. v. C., M., St. P. &. P. R. R. Co.*, 294 U.S. 499, 506, 55 S.Ct. 462, 79 L.Ed. 1023 (1935).

which a reasonable and prudent antitrust lawyer would have deemed advisable under the circumstances.

The late Emory Buckner (preceptor in trial practice of the late second Justice Harlan [7]) is reputed to have said that it is easy to over-try a case but impossible to over-prepare a case.

A victorious antitrust plaintiff is entitled to receive a counsel fee commensurate with the thoroughness of preparation, as well as skill in trial, which Buckner's philosophy envisaged.

We shall therefore view the various issues contested here with the attitude that, merely because the obligation to pay the fee is statutory, the size of the fee need not be a niggardly or skimpy pittance, but that plaintiff was intended by Congress to receive fair and reasonable compensation for all legal services reasonably necessary in connection with the case.

■ The foregoing principle leads to rejection of defendants' contention that because the case was tried twice counsel is not entitled to compensation for work done at the second trial, on the theory that such work was "duplication." [8] It seems clear that it is reasonably necessary to retry a case when an appellate court directs a retrial. Counsel are not to be penalized by being required to work for nothing as punishment for failure to know at the first trial what the Court of Appeals was going to do.

■ The same reasoning requires rejection of defendants' second contention, that the fee should be reduced because plaintiff won on appeal only with respect to one issue, and lost on other issues. [9] Apart from the fact that the Court of Appeals did hold that price-fixing and other allegations had in fact been proved, but that no sufficient proof of damages (injury to business or property as required by 15 U.S.C. § 15) had been adduced, it seems clear that a reasonable and prudent antitrust lawyer (not necessarily one as thorough as Emory Buckner) would have litigated these issues in the reasonable exercise of professional judgment. There was sufficient merit in the points raised to justify their inclusion in the case. They were not frivolously argued merely for harassment or vexation, or for purposes of delay.

■ The same principle requires rejection of defendants' argument that services arising out of certiorari proceedings in the Supreme Court should be excluded. [10] While notoriously more petitions for certiorari are unsuccessful than are successful, filing them is recognized as part of the game, and we can not say that the mutual petitions in this case were not resorted to in the normal exercise of reasonable professional diligence.

■ Defendants object to the charge for the use of Lexis computer service, describing it as "an impermissible anthropomorphism [11]." This service, however, replaces by instantaneous and supposedly infallible retrieval, many hours which would be billable if performed by human talent. The amount allowable, however, is merely the cost of the service. It is not included as billable hours of legal service. The item is expressed in terms of hours merely because the Lexis machine is made available on that basis to users.

Similar reasoning leads to rejection of defendants' objection to plaintiff's out-of-pocket cost items. These are perhaps not taxable by the Clerk as court costs as authorized by statute, but are certainly expenses which a reasonable and prudent antitrust lawyer would incur for the benefit of his client's case.

■ We note that 15 U.S.C. § 15 does not award merely court costs to a successful antitrust plaintiff, but "the cost of suit."

---

7. David L. Shapiro (ed.), *The Evolution of a Judicial Philosophy: Opinions and Papers of Justice John M. Harlan* (1969) xx.

8. Defendants' brief, p. 2.

9. Defendants' brief, p. 3.

10. Defendants' brief, p. 7.

11. Defendants' brief, p. 9.

This is a more comprehensive term, evidently embracing "the expense of prosecuting the suit to a successful conclusion." The court costs in the technical sense are of course included in "the cost of suit," but other necessary and reasonable expenses are also included (except the attorneys fee, which is specified separately as an additional item to be paid to plaintiff).

In this connection we note also that the time spent in litigating the amount of the fee payable is also to be included as part of the losing defendant's obligation.

The statute here makes the fee a debt due to the plaintiff, to make him whole by redressing the wrong done by the violation of the antitrust laws. Just as the relief *pendente lite* afforded by a preliminary injunction is designed to place a plaintiff in the same situation he would be in if the litigation could be decided immediately,[12] so the award of cost of suit and attorney fee in an antitrust case is designed to afford the plaintiff the relief to which he is entitled without any diminution by reason of the financial burden of making the judicial machinery work in his behalf.

Since the antitrust statute thus provides for collection of the expenses and attorney's fee by the plaintiff himself, in order to relieve him of the financial burden incident to litigation,[13] the considerations applicable to class actions are not pertinent here. The plaintiff in the case at bar is the only beneficiary of the instant litigation and the only party involved.[14] There is no occasion to consider the extent to which other passive parties who sat on their hands have been benefitted by the exertions of lawyers who organized the enterprise and created, increased, or preserved a fund constituting a pie to be sliced up among various claimants. The attorneys here have no conflict of interest with their client.[15] The payment of a fair and reasonable fee by the wrongdoing defendants will merely lift a financial burden from the innocent party and place it upon the guilty.

Largely because of evils arising out of class actions, and the judicial reactions thereto,[16] the proceedings for determining fees are developing a regrettable tendency to "assume massive proportions, perhaps even dwarfing the case in chief."[17] To the extent that courts prescribe procedures which must be exhausted before a successful plaintiff may obtain the fruits of his invocation of the judicial process, the expense of complying with such procedures is just as much a condition precedent to a litigant's obtaining the relief to which he is entitled as the outlay for court costs which litigants (except the government and indigents under some circumstances[18]) must fork out before indulging in the privilege of seeking justice at the hands of a judicial

---

**12.** As an international tribunal said, by this procedure the courts "seek to remedy the delays of the judicial process, so that to the extent possible the outcome of the case is the same as if it could be terminated in a day." As an illustrious Italian authority on civil procedure stated, the relief afforded should be as advantageous to the plaintiff as if it were obtained at the moment of filing the complaint; the duration of the lawsuit should not bring detriment to the plaintiff. Quoted in Dumbauld, *Interim Measures of Protection in International Controversies*, (1932) 20. To effect the intent of Congress in the antitrust statute, one needs only to substitute "expense of the lawsuit" for "duration [or delay] of the lawsuit."

**13.** Commentators have emphasized that the high cost of litigation now makes it worthwhile to sue only if an amount of more than $50,000 is involved.

**14.** Cf. *Lindy II*, 540 F.2d at 111, where this situation is reserved, and distinguished from a case where distribution of a fund is involved, and only the attorney benefits by the time spent in connection with the fee application.

**15.** Cf. *Prandini v. National Tea Co.*, 557 F.2d 1015, 1020–21 (C.A.3, 1977).

**16.** Resulting in the elaboration of criteria which Judge Gibbons has characterized as a "significant advance in the law." 540 F.2d at 126.

**17.** *Lindy II*, 540 F.2d at 116. One is reminded of rate cases involving public utilities, such as *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

**18.** *Boddie v. Connecticut*, 401 U.S. 371, 381, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

tribunal. We therefore conclude that the time devoted by plaintiff's attorneys in prosecuting the fee application should not be excluded.

■ Having now disposed of defendant's collateral contentions, we must face the real meat of their objection to the application, namely the challenge to the hourly rates claimed by plaintiff's counsel.

Plaintiff's "top banana," Clayton A. Sweeney, seeks a rate of $60 per hour for the first trial in the District Court in 1974, a rate of $85 before the Court of Appeals and the Supreme Court of the United States, and a rate of $90 at the second trial before the District Court. This discrepancy is doubtless due to the progress of inflation rather than to any disesteem of the dignity of the appellate tribunals or any conviction that the District Court is a hard place in which to work.

For the second trial David B. Buerger at $150, James G. Park and John J. McLean seem to have participated for a brief interval in the firm's counsels, resulting in a charge of $342. The Court is not satisfied that Mr. Sweeney required the aid of any associates more equal in rank than himself, and will eliminate $342 from the "lodestar" figure.

Defendants vigorously attack the rates used in plaintiff's calculations because of the circumstance that the computer printouts attached to the Sweeney affidavit of October 20, 1977, disclose two columns, specifying different figures, described respectively as "required" and "recommended." As explained at oral argument, the "required" charge is for internal use by the firm, and indicates the minimum charge which would make it worthwhile for the firm to accept or handle a matter. The "recommended" figure that which the firm would ordinarily charge in the absence of special circumstances.

Defendants contended strenuously at oral argument that the lower or minimum rate should be used, especially since the fee here involved was not the result of contractual dealing with the firm by a client but was an obligation imposed upon defendants *in invitum* by statute. We have disposed of these arguments previously in this opinion, and concluded that defendants are not entitled to minimum or bargain rates, but must pay a fair and reasonable rate.

The Court at oral argument expressed some misgiving as to whether the "recommended" rate was merely a "paper rate" (to use the railroad and ICC expression for a rate which does not move any traffic but simply is published to comply with tariff publication requirements that there be an available tariff rate for every commodity which might be tendered to a carrier for transportation). In other words, the Court wished to be satisfied that the "recommended" rates were "going" rates which were in fact regularly charged and collected by the firm in the normal course of business.

In response to the Court's request, Mr. Sweeney filed his supplemental affidavit of November 8, 1977, in which it is stated that the recommended rates "are regularly billed to a substantial number of clients of the firm and regularly obtained." In three antitrust cases handled by the firm during the period 1973–1977, the clients paid fees amounting to 94.1, 96.3, and 99.4% of the recommended rate. These were not contingent fee cases (apparently the firm was representing defendants in these cases). Mr. Sweeney also states that based on his familiarity with the "rates charged by firms of equal stature for similar work" the rates requested in plaintiff's application "are well within the range of rates charged in the cities of Pittsburgh and Philadelphia."

While it perhaps muddies the waters to refer to Philadelphia (New York, Chicago, Washington, D. C. and the West Coast are probably equally active centres of antitrust practice), the Court is satisfied that the hourly rates claimed are within the zone of reasonableness. Since in the three cases cited (where doubtless the firm puts its best foot forward) only 96.6% of list was collected, we shall reduce the claimed "lodestar" by 5%. That gives a figure of $269,474.29. Deducting the $342 previously mentioned

we find the "lodestar" figure to be $269,132.29.

It remains to consider any appropriate adjustment for the contingency and quality factors.

Remembering that the quality factor compensates only for unusual performance in the particular case (normal quality being reflected in the hourly rate commanded), we find that quality performance at a high level was observed during the course of both trials of the case at bar, not by reason of any specific incidents of outstanding virtuosity,[19] but by reason of the continuously sustained high pitch required by the vigorous and constant high quality opposition offered by defense counsel.

Just as a victorious tennis player or football team necessarily plays better against a good opponent, the legal skills of plaintiff's counsel were called forth and intensified by the spirited contest with able defense counsel. Quantifying, we conclude that a 20% increase, or $53,826.46, would be proper.

With respect to the contingency factor, we find that there is indeed substantial risk involved in the attempt to win and sustain on appeal and collect a large verdict in an antitrust case.

There was a time when the climate in the Supreme Court with respect to antitrust litigation was such that Mr. Justice Stewart could quip that the government always won.[20] That atmosphere is now believed to be more favorable to defendants.

In any event it never extended to private litigation, but to the major cases brought by the Department of Justice or the Federal Trade Commission in the public interest and affecting industry-wide conspiracies rather than the restrictive practices of a single company.

Nor is the probability of success any brighter if decisions of the Court of Appeals are scrutinized. According to plaintiff's petition for certiorari at No. 75–1579 October Term, 1975 (c. d. 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387), "Over the last 25 years, with one exception, no judgment or verdict for money damages has been passed upon [by the Third Circuit Court of Appeals] and permitted to stand." [Petition, p. 9]. We have not verified the correctness of this statement or reviewed the cases cited in support thereof by plaintiff at pages 9–12 of the petition, but assume its accuracy, being mindful of the tradition of scrupulous precision observed by Department of Justice attorneys in papers submitted to the Supreme Court, and presuming that a similar responsible attitude characterizes plaintiff's counsel in practicing before that august tribunal. Plaintiff's case therefore is subject to a very substantial risk or contingency factor.

We therefore conclude that a 100% contingency factor would be appropriate. There was an equal chance of winning or losing, in our judgment, when plaintiff undertook to challenge in the courts defendants' anticompetitive behavior. Doubling the "lodestar" figure gives $538,264.58. Adding the quality factor, as calculated above, brings the total to $592,091.04. To this, as we have previously determined, the out-of-pocket expenses of $50,841.64 must be added, giving a grand total of $642,932.68.

To this amount must be added thrice the amount of the verdict (or $934,047.00). Judgment is therefore entered for plaintiff and against defendants in the amount of $1,576,979.68.

19. One particularly memorable instance of unusual performance may be noted: the devastating cross-examination of defendants' vice-president in charge of sales (Tr. 2620–24), referred to in 435 F.Supp. at 689.

20. *U. S. v. Von's Grocery Co.,* 384 U.S. 270, 301, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966).