In re MONTGOMERY COUNTY REAL ESTATE ANTITRUST LITIGATION. This Document Relates To: All Actions.

David H. ROSENBERG et al.

v.

JACK FOLEY REALTY, INC., et al.

James E. STARNES et al.

v.

JACK FOLEY REALTY, INC., et al.

Norman GOLNER et al.

v.

JACK FOLEY REALTY, INC., et al.

STATE OF MARYLAND ex rel. Stephen H. SACHS

v.

JACK FOLEY REALTY, INC., et al.

Joseph SMISEK et al.

v.

JACK FOLEY REALTY, INC., et al.

Master No. B–77–513.
Civ. Nos. B–77–513, B–77–519, B–77–570, B–77–618 and B–77–755.

United States District Court,
D. Maryland.

June 8, 1979.

Andrew J. Graham, Kramon & Graham, Baltimore, Md. and Timothy J. Bloomfield, Roy E. Green, Dunnells, Duvall & Porter, Washington, D. C., for plaintiffs David and Marjorie Rosenberg.

Michael L. Glaser, M. Scott Johnson, Glaser, Fletcher & Johnson, P. C., Potomac, Md., for plaintiffs James and Mary Starnes.

Marvin M. Waldman, David A. Jones, Goldberg, Waldman, Days & Jones, Chevy Chase, Md., for plaintiffs Norman and Jeanne Golner.

William C. Sammons, Gary Jay Katz, Tydings & Rosenberg, Baltimore, Md. and Jerry S. Cohen, Michael D. Hausfeld, Kohn, Milstein & Cohen, Washington, D. C., for plaintiffs Joseph and Nancy V. Smisek.

Charles O. Monk, II, Asst. Atty. Gen., Baltimore, Md., for plaintiffs State of Maryland ex rel. Francis B. Burch, Atty. Gen. of Maryland.

B. George Ballman, Staley, Prescott & Ballman, P. A., Kensington, Md. and John H. Lewin, Jr., James K. Archibald, Venable, Baetjer & Howard, Baltimore, Md., for defendants Jack Foley Realty, Inc. and John P. Foley, Jr.

E. Austin Carlin, Murphy & Carlin, Bethesda, Md. and Raymond W. Bergan, Robert P. Watkins, Williams & Connolly, Washington, D. C., for defendants Bogley, Inc. and Robert W. Lebling.

Charles N. Shaffer, Peter I. J. Davis, Rockville, Md., for defendant Shick and Pepe Realty, Inc.

William B. Somerville, Smith, Somerville & Case, Baltimore, Md. and James P. Mercurio, Lewis E. Leibowitz, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for defendant Shannon & Luchs Co.

John G. Gill, Jr., Rockville, Md. and William W. Cahill, Jr., Weinberg & Green, Baltimore, Md. and Richard A. Hibey, Robert Wallace, Surrey, Karasik & Morse, Washington, D. C., for defendants Colquitt-Carruthers, Inc. and John T. Carruthers, Jr.

Edwin Collier, Collier & Shaffer, Silver Spring, Md. and William O. Bittman, George R. Clark, Pierson, Ball & Dowd, Washington, D. C., for defendant Robert L. Gruen, Inc.

BLAIR, District Judge.

This litigation involves five consolidated civil antitrust class actions brought against six corporations and three individuals in the wake of the defendants' indictment and subsequent conviction of price fixing in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. The complaints, tracking the language of the indictment, allege violations dating from September 5, 1974 until April 1, 1977. The defendants are real estate brokers and brokerage firms which are, and were during the years in question, engaged as competitors in the business of real estate in Montgomery County, Maryland. There are two classes of plaintiffs. The "private" class comprises four consolidated class actions brought pursuant to 15 U.S.C. § 15 by individual homeowners who sold their houses in Montgomery County, availing themselves of the defendants' services. These individuals allege that as a result of the defendants' illegal conspiracy to fix prices, they paid commission rates higher than they would have paid but for the defendants' unlawful acts. The "State" class involves a *parens patriae* action brought under 15 U.S.C. § 15c on behalf of natural persons within the State of Maryland who similarly sold used residential real estate in Montgomery County through the services of the defendants on or after September 30, 1976, the effective date of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. §§ 15c *et seq.* Both the private and the State classes have sought declaratory relief, costs, and treble damages. The State has sought injunctive relief as well. The defendants deny liability.

All parties have reached a compromise settlement of the claims in this case, and have submitted their proposal to the court for its determination, required by Fed.R.

Civ.P. 23(e) and 15 U.S.C. § 15c(c), whether the settlement is fair, reasonable, and adequate.

*History of the Litigation*

On April 1, 1977, a United States grand jury returned an indictment against the defendants named in this suit, charging that they had conspired to fix, raise and maintain brokerage commission rates on listings of used residential real estate in Montgomery County at seven percent, in restraint of trade, in violation of 15 U.S.C. § 1. The defendants were convicted after a nine-day jury trial before this court in September 1977. Criminal No. B–77–0185. Their conviction was affirmed. *United States v. Foley,* 598 F.2d 1323 (4th Cir. 1979).

It was proven at trial that during the summer of 1974, and for some time previously, the prevailing commission rate charged by real estate brokers for their listing and selling services was 6% of the sale price. On September 5, 1974, defendant John P. Foley, Jr. invited the other defendants,[1] at the time the leading realtors in the county, to a dinner party at the Congressional Country Club in Bethesda, Maryland. After dinner, Foley rose and announced that his firm intended to raise its commission rate to 7%. The guests discussed the change and, during the ensuing months, each of the defendants adopted the seven percent rate.

Within a matter of days after the return of the indictment, the first of the private class actions was brought. All of the defendants filed motions to dismiss the civil cases for lack of jurisdiction. This court had denied similar motions in the criminal case and decided to deny the civil motions for the same reasons. Memorandum and Order of October 19, 1977. The defendants also filed a joint motion for partial summary judgment challenging the standing of one of the plaintiffs to sue. The court denied this motion as well. Memorandum and Order of April 7, 1978. In the mean-

---

1. The corporate defendants were represented, of course, by individual officers.

time, the parties undertook considerable discovery on both the maintainability of the class actions and on the merits.

On April 7, 1978, over the vigorous opposition of the defendants, this court certified class actions in accordance with Fed.R. Civ.P. 23(b)(3) and 23(c)(1). The private class consists of

> all persons who have sold used residential real estate in Montgomery County, Maryland, in whole or in part through the services of defendants from September 1, 1974 through September 30, 1976 and who entered into brokerage agreements with any of defendants wherein they agreed to and did pay a brokerage fee of 7% in connection with the sale of such used residential real estate.

The court retained jurisdiction, as provided by Fed.R.Civ.P. 23(c)(1) to alter, amend, modify, annul, vacate or supplement the certification order at any time prior to judgment on the merits. Memorandum and Order of April 7, 1978.

This court will certify a Settlement Class composed of all those to whom notice was given and who did not exercise their right to opt out.[2]

The State class did not require certification. 15 U.S.C. § 15c. Nevertheless, the defendants resisted the State's participation in this suit by moving to dismiss the State's case for lack of standing, lack of subject matter jurisdiction and for absence of a "case or controversy" as required by Art. III, § 2 of the United States Constitution. This motion was denied. The court also rejected the defendants' motion to deny the State's request under 15 U.S.C. § 15f(b) to consult grand jury materials, and ordered that such investigative materials be made available to the State. Memorandum and Order of May 30, 1978, 452 F.Supp. 54 (D.Md.1978).

Having certified the class and disposed of all preliminary motions, this court ordered that notice be directed to all members of both the private and the State class. Pretrial Order No. 4, June 26, 1978. Notice was effected by mail and by publication. The number of potential plaintiffs is estimated to be about 3300. Of these, some 1875 have received notice prior to January 19, 1979 and have not opted out of the litigation.

Prior to certification of the private class, the private plaintiffs and the defendants had initiated tentative settlement negotiations. After certification, these negotiations gained momentum. The court was aware throughout this period of the status of the discussions, and of the kinds of relief that were being proposed. The settlement agreement which was taking shape between the private class and the defendants did not, originally, satisfy the Maryland Attorney General, the representative of the State class. The private litigants argued that the case could be settled in full without the Attorney General's assent—that the private class could and should, for settlement purposes, be extended to subsume the State class. The court declined to accept this argument, and ruled, by Memorandum and Order of July 17, 1978, that such an extension was legally impermissible and factually undesirable.

### The Settlement

Accordingly, the settlement negotiations between the private plaintiffs and the defendants proceeded to consummation, while the State class prepared for trial. The private class, although confident of its ability to prove liability, was justifiably concerned about the defendants' ability to satisfy a money judgment should the case go to trial. It appeared that a large judgment could force all but the two largest firms out of business, with the result that the plaintiffs would be under-compensated and competition in the Montgomery County real estate market would be diminished still further.

With these difficulties in mind, the parties devised a settlement which, it was hoped, would provide approximate restitution to class members without bankrupting

---

**2.** Although the terms of the notice that was directed to the parties was slightly overinclu-

sive, the defendants do not object to certification of a Settlement Class on these terms.

the defendants. The settlement agreement provided[3] that for each property qualifying its seller for class membership, a certificate would be issued which would entitle the holder to list with one of the defendants one parcel of used, single-family residential real property at a brokerage fee of 5%. The certificates were to be negotiable to two successive assignees, and to remain valid until December 31, 1985. Since the "prevailing" brokerage rate appears to be 6% at this time, and shows no sign of declining, it is estimated that the value of a certificate would be equivalent to at least 1% of the current sale price of the holder's present residential property.[4]

The defendants have agreed to accept the listings (at 5%) of all certificate holders upon the same terms and conditions as all other listings, and to "apply equivalent effort" to the sale of houses covered by certificates, including but not limited to placing the property in the appropriate multiple listing service.

The defendants have further agreed to establish a clearinghouse for the purpose of helping those certificate holders desiring to sell their certificates to find buyers. The clearinghouse will regularly advertise the availability of the certificates and will maintain and distribute a list of all holders who wish to sell. Holders will be entitled to set the price they are willing to accept for their certificates.

Additionally, the defendants have agreed to establish a Settlement Fund which is intended to cover the costs of this litigation, attorneys' fees and expenses including the expenses of class notification, printing and distribution of certificates and clearinghouse advertising and administration. The parties have named three trustees to oversee the distribution of notices and certificates.[5]

The Attorney General initially disapproved the "scrip" settlement negotiated by the private parties. The State's principal concern was that the certificates would channel a disproportionate amount of business to the defendant brokers. The Attorney General considered that the anticompetitive effect on the relevant real estate market threatened greater harm to the public interest than the concomitant benefits to the natural persons in the State class warranted. The State was also concerned about the ability of class members who had moved out of the area to convert their certificates to cash by entrusting them to the clearinghouse.

The State, therefore, undertook preparations for trial in the fall of 1978. The Attorney General deposed the principal government witnesses in the criminal case, reviewed the documentary evidence and the listing records of the Montgomery County Board of Realtors and gained access, pursuant to 15 U.S.C. § 15f(b) and this court's Order of May 30, 1978 to all grand jury materials compiled in connection with the criminal investigation. This discovery revealed to the Attorney General a fact that in his judgment, significantly impaired his chances of proving injury to the persons he represented: that after the first wave of grand jury subpoenas in November 1975, the defendants reduced their brokerage commission rate to the prevailing 6%. Since the State represented only those people who listed or sold after September 30, 1976, it became concerned that it would have to shoulder (without help from the private class) the heavy burden of proving that the conspiracy continued to affect the marketplace in such a way that the State claimants would not have paid 7% but for the conspiracy. The State was also concerned about the defendants' ability to pay a litigated judgment.

---

3. Amendments to the original agreement will be discussed *infra* at pages 314–315.

4. *See* page 318 *infra*.

5. The above is intended to be only an outline of the salient features of the original private class settlement agreement, not an exhaustive catalogue of its many details. The agreement, along with subsequent agreements and amendments are available for inspection in the master file in this case in the Office of the Clerk of this Court.

For these reasons, and after investigating the impact the plan would actually have on the market, the Attorney General reevaluated his position on the "scrip" settlement. After further negotiations with the defendants, the State entered into a separate but substantially similar agreement on behalf of the natural persons it represented. This agreement contains two features not present in the private agreement. First, there is a means by which the Attorney General is empowered to monitor the rate at which certificates are redeemed. The Attorney General expects that no fewer than 30% of the certificates will be redeemed during the first two years of the settlement period, and if fewer than 30% are redeemed, he may bring this fact to the attention of the court, with the alternative of seeking a modification. Second, the clearinghouse for certificates issued under the State settlement is to advertise more frequently than the private clearinghouse. It was felt that these differences would make the clearinghouse more responsive to holders wishing to sell.

### The Court's Role

After both the State and the private class had negotiated settlement agreements with the defendants, this court determined preliminarily that the proposed settlement was within the range of possible approval and should be submitted to the class members.[6] This preliminary determination reflected the court's long familiarity with the litigation, its knowledge of the discovery undertaken to date, and of the State's reevaluated position vis-a-vis settlement as well as its knowledge, based upon confidential presentence submissions in the criminal case, of the defendants' financial positions. Accordingly, on October 27, 1978, this court ordered that notices be directed by mail and by publication to the classes, informing the members about the litigation and the terms of the proposed settlement. The class members were instructed that if they ob-

jected to the settlement as outlined in the notice, they should inform the court of their objections in writing. They were advised further that they could appear and voice their objections either to the settlement or to counsel's petitions for fees at a hearing which was to be held approximately eight weeks after notices were mailed to determine the fairness and adequacy of the settlement proposal. This court received approximately 125 written objections from members of the plaintiff class as well as a number from competing realtors. Counsel for all sides submitted detailed briefs in response to the objections and in support of settlement.

The majority of the objections received from class members voiced a preference for a cash settlement over "scrip" and complained of the anti-competitive effect thought to inhere in the certificate plan. A number would settle for no less than treble damages, and still others felt that the defendants were being "rewarded" for their wrongdoing in that they stood to "corner" a captive market of certificate holders. Many out-of-state objectors feared that the clearinghouse would prove unworkable to them, and expressed dissatisfaction with the "cutoff" date of December 31, 1985 and the limit on transferability. Others, assuming that the court was a party to the negotiations, advanced counterproposals.

A group of some twenty-eight real estate brokers petitioned jointly to be heard in opposition to the proposed settlement, and the court received and considered their comments as well.[7] Their objection is twofold: (1) that the certificate plan would guarantee the defendants the business of the class members or their assignees and (2) that it would have the effect of stabilizing the brokerage commission rate at 5%.

The court held a hearing on January 19, 1979 to hear comments and to gather information both from supporters and from opponents of the proposed agreement. The parties first gave a brief history of the

---

6. *See* Manual for Complex Litigation, § 1.46 at 53 (1977).

7. They were never formally made a party to this action, however, and never submitted to the jurisdiction of this court.

litigation and summarized again the terms of the proposed settlement. Six class members then voiced their concerns and directed questions to counsel, chiefly about the operation of the clearinghouse, and the practical cash value of the certificates.

Counsel for the non-party realtors argued on their behalf that the settlement as proposed would unleash an unnatural force in the marketplace. These non-party realtors offered two modifications which, it was felt, would vitiate the perceived anti-competitive effect: (1) that the certificates be redeemable with any broker, which broker could in turn recover his 1% "loss" in a subsequent fee-splitting transaction with one of the defendants, and (2) that rather than "fix" the percentage at 5%, the certificates should be worth a 1% discount from whatever the "prevailing" rate happened to be at the time of redemption.

When all objectors had spoken, the court asked the parties to submit factual information in support of their contention, advanced in the briefs submitted in response to objections, that the market effect of the settlement would not be significant. Data were received both before and during the hearing, which threw considerable light on the size and activity of the residential real estate market in Montgomery County and the greater Washington, D. C. metropolitan area. With the help of the parties, the court has gathered additional relevant information since.

Finally, the court heard plaintiffs' counsel argue in support of their petition for attorneys' fees. No class member objected.

Subsequent to the January 19, 1979 hearing, the court met with lead counsel in chambers to discuss what it considered were serious anti-competitive drawbacks to the settlement as proposed. The court suggested to the parties that no "scrip" settlement would be acceptable unless the certificates were redeemable with brokers other than the defendants. This was not suggested as a matter of equity for non-defendant brokers, many of whom had apparently charged 7% during the same time the defendants' conspiracy was in effect. Rather the court was concerned that certain class members had expressed an unwillingness to deal with the defendants and, more significantly, that the certificate plan would have an anti-competitive impact on the real estate market by relegating up to 3300 brokerage commissions to the half dozen defendant firms. Those defense counsel present appeared to agree to allowing other brokers to retire scrip, but indicated that they could not recommend to their clients any feature which would allow non-defendant brokers to redeem the scrip from defendants.[8] Plaintiffs' counsel were amenable to allowing non-defendant brokers to honor the certificates, provided that such non-defendants submit to the terms of the settlement agreement, particularly the "best efforts" clause.

All parties were dissatisfied with the non-defendant realtors' proposal that the worth of the certificates "float" at 1% less than the prevailing rate. Aside from the difficulty of determining any broker's "prevailing" rate, it was generally assumed that the commission rate was more likely to rise to 7%, thus doubling the value of certificates, than to decline.

After this meeting, counsel conferred and submitted an amendment to the proposed settlement which provides that the certificates shall include the names not only of

---

**8.** It was agreed that administering such a redemption plan would be exceedingly difficult. Moreover, the defendants pointed out that their clients would not tolerate such an arrangement for the reason that during the years covered by this suit, many if not all of the 28 non-defendant realtors who petitioned the court, as well as others, had charged 7% brokerage commissions or, at the least, had split 7% fees with others in "co-op" transactions. It is estimated that from 1974–1977 over 50% of real estate listings at 7% commission were "co-op" sales, with each participating broker taking 3.5%.

Although the gravamen of the complaint is not "charging 7%" but conspiring to fix prices, the defendant firms felt that they should not be required to reimburse 1% to a competitor who voluntarily accepts a 5% certificate when competitors generally benefited incidentally and without liability from the 7% commission rate during the conspiracy.

the defendants but of other licensed real estate brokers in the greater Washington metropolitan area who agree to be bound by the settlement and subject to the jurisdiction of this court. The defendants are to attempt to notify other firms of their option to participate. The certificates will specify that the holder is not obliged to list with a defendant realtor but is free to submit his certificate to any listed realtor he chooses. In this posture, then, the proposed settlement agreement is tendered for the court's approval.

*Factors Underlying the Court's Determination Whether to Approve a Class Settlement*

■ Neither Fed.R.Civ.P. 23(e) nor 15 U.S.C. § 15c(c) contains any standard against which a court may measure a proposed compromise of a class action. Courts have identified several factors, however, which merit consideration.[9] These may be broken down into two major categories: those which go to "fairness" and those which go to "adequacy" of a settlement. There is in this case the additional consideration whether the proposed settlement will itself have, if approved, an anticompetitive effect.

### A. Fairness

■ The factors tending to reveal the "fairness" of a settlement are those which indicate the presence or absence of collusion among the parties. Because of the danger of counsel's compromising a suit for an inadequate amount for the sake of insuring a fee, the court is obliged to ascertain that the settlement was reached as a result of good-faith bargaining at arm's length. *Percodani v. Riker-Maxson Corp.*, 50 F.R.D. 473, 477 (S.D.N.Y.1970). The good faith of the parties is reflected in such factors as the posture of the case at the time settlement is proposed, the extent of discovery that has been conducted, the circumstances

surrounding the negotiations and the experience of counsel. *Flinn v. FMC Corporation*, 528 F.2d 1169, 1173 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *see generally Saylor v. Lindsley*, 456 F.2d 896, 904 (2d Cir. 1972) (inadequate discovery revealed facts insufficient to support trial court's approval of settlement); *In Re GM Corporation Engine Interchange Litigation*, 594 F.2d 1106, 1124 (7th Cir. 1979) (trial court abused its discretion by approving settlement without carefully examining conduct of parties' negotiations).

■ These factors, considered in the light of this court's long familiarity with the case, indicate not the slightest shadow of collusion. Counsel for all parties are able and experienced antitrust litigators. This court's opinion that the class representatives would fairly and adequately protect the interests of the class members (Memorandum and Order of April 7, 1978 at 8) has been borne out. The case has been hard-fought from the outset, and the alternative of settlement was only raised after several substantial pretrial challenges had failed.[10] Almost as soon as the parties began to consider settlement, this court became award of the intensive negotiations undertaken. The parties instituted substantial discovery and the facts of the case on the merits were well understood by all, not least by the court, as a result of the trial of the criminal case in September 1977. In short, there is no hint that the settlement was prematurely reached or that the negotiations were conducted in bad faith or collusively. On the contrary, it appears to this court that the parties have pursued their compromise in a manner entirely consistent with high standards of fairness to the class.

### B. Adequacy

■ In evaluating the "adequacy" of a proposed settlement, the court must weigh

**9.** These are factors which are typically applied to settlement of class actions under Fed.R.Civ.P. 23(e). There appears to be no reason why the same should not apply equally to settlements reached by State Attorneys General

under the Hart-Scott-Rodino Act, 15 U.S.C. § 15c(c).

**10.** *See* pages 310 to 311 *supra*.

the likelihood of the plaintiffs' recovery on the merits against the amount offered in settlement. *State of West Virginia v. Chas. Pfizer & Co., Inc.*, 314 F.Supp. 710, 740 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). This necessarily requires the court to make a careful assessment of all the facts and a thorough analysis of the applicable law. *See, e. g., Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), *reh. denied*, 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1968), (compromise in bankruptcy). It is not, of course, necessary or desirable to "try" the case to determine whether a settlement is adequate, since the very purpose of settlement is "to avoid the trial of sharply disputed issues and to dispense with wasteful litigation," *Saylor v. Lindsley*, 456 F.2d 896, 904 (2d Cir. 1972). *See also Flinn v. FMC Corporation*, 528 F.2d 1169, 1172–73 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976).

■ In assessing the adequacy of a proposed settlement, courts should weigh the amount tendered to the plaintiffs against such factors as (1) the relative strength of the plaintiffs' case on the merits, *see, e. g., Percodani v. Riker-Maxson Corp.*, 50 F.R.D. 473, 478 (S.D.N.Y.1970); (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 463 (2d Cir. 1974) and *see, e. g., Trainor v. Berner*, 334 F.Supp. 1143, 1149 (S.D.N.Y.1971); (3) the anticipated duration and expense of additional litigation, *City of Detroit v. Grinnell Corporation*, 356 F.Supp. 1380, 1388–89 (S.D.N.Y.1972), *aff'd in part, rev'd in part and dism. in part*, 495 F.2d 448 (2d Cir. 1974); (4) the solvency of the defendants and the likelihood of recovering on a litigated judgment, *City of Detroit, supra*, 356 F.Supp. at 1389; and (5) the degree of

opposition to the settlement, *see, e. g., Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), *reh. denied*, 420 U.S. 913, 95 S.Ct. 836, 42 L.Ed.2d 844 (1975). *See generally, City of Detroit, supra*, 495 F.2d at 463; *Flinn v. FMC Corporation*, 528 F.2d 1169, 1172–74 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); K. M. Forde, *Settlement of the Class Action*, 5 A.B.A. J. Sect. of Litig. 23 (1978); Note, *Factors Considered in Determining the Fairness of a Settlement*, 68 NW.U.L.Rev. 1146 (1974).

(1) In this case, the plaintiffs are well-situated to establish a *prima facie* case of liability, on the merits, since the defendants have already been convicted of criminal price-fixing. (2) Nevertheless, the plaintiffs would not be able to rely exclusively upon proof of liability adduced at the criminal trial, since the government did not offer any evidence of the defendants' conduct after December 1975. Furthermore, the discovery materials gathered by the Attorney General in preparation for trial in this case revealed that by late 1975 or early 1976, each of the defendants abandoned its policy of charging 7% and reverted in large part to accepting listings at 6%. Additionally, the defendants could be expected to offer proof that, prior to entering their illegal agreement, they, and other real estate brokers as well, occasionally charged sellers a 7% commission, and that during the life of the conspiracy, realtors other than the conspirators occasionally charged 7%. For these reasons, although the original conspiracy is susceptible of proof, it would be extremely difficult to establish the necessary proof that each of the plaintiffs would not have paid 7% but for the enduring effect of the defendants' illegal combination. *See City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 456 (2d Cir. 1974).[11]

---

**11.** Another possible defense might be that raised successfully by the defendants in *Reiter v. Sonotone Corporation*, 579 F.2d 1077 (8th Cir. 1978), later reversed, —— U.S. ——, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), that consumers alleging no injury of a commercial or competitive nature have no standing to invoke the treble damage provision of Section 4 of the

■ The availability of substantial defenses in this case, coupled with the difficulties of proof of causation and injury the plaintiffs would encounter were the case to go to trial strongly suggest that substantial weight should be accorded to the assessment of plaintiffs' counsel that settlement is the preferable alternative. *See Trainor v. Berner*, 334 F.Supp. 1143, 1149 (S.D.N.Y. 1971) (though court not to substitute its judgment for that of parties, settlement approved in light of "impressive battery of significant defenses"); *Schimmel v. Goldman*, 57 F.R.D. 481, 484 (S.D.N.Y.1973) (settlement favored where plaintiffs' right to recover subject to serious questions of fact or law).

(3) The third factor, cost of additional litigation, also counsels settlement. It is clear that trial of this case would be protracted and complex, and the financial burden upon all of the private parties would be substantial. Additionally, the tax on the defendants' coffers of further litigation would diminish the likelihood of full or adequate recovery for members of the plaintiff class.

(4) Doubts as to the defendants' ability to satisfy a cash judgment have suggested this settlement from the outset. Single damages for all claimants have been estimated at approximately $1.5 million. Treble damages, taken together with plaintiffs' fees and costs and the defendants' own counsel fees could amount to over $5 million.

This court received financial reports from the defendants for the purpose of sentencing them after their convictions in 1977. This information has recently been updated.[12] The financial records and reports of the defendants indicate that only one of the six firms is vital: two are currently operating at a deficit, and the remainder are very thinly capitalized indeed. All but one have shown steady losses over the last three years. This factor most strongly counsels settlement and moreover supports the kind of non-cash settlement proposed here. There is simply no way that these six defendants could provide a cash settlement or satisfy a money judgment which would even approach full compensation (let alone treble damages) for the plaintiffs' injury. "The prospect of a bankrupt judgment debtor at the end of the road does not satisfy anyone involved." *City of Detroit v. Grinnell Corporation*, 356 F.Supp. 1380, 1389 (S.D.N.Y.1972), *aff'd in part, rev'd in part and dism. in part*, 495 F.2d 448 (2d Cir. 1974).

■ (5) Finally, in determining the acceptability of a proposed class action settlement, the court may consider the strength of the opposition to the settlement from the class members. *Flinn v. FMC Corporation*, 528 F.2d 1169, 1173 (4th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Grinnell, supra*, 495 F.2d at 462.

The response of the class to the settlement plan is helpful in this case because, for the most part, the affected individuals would appear to be educated, knowledgeable people. Montgomery County, an affluent suburb of Washington, D. C., harbors a high percentage of professionals and civil servants: people whose education and background prepare them to act in their own self-interest. It appears to this court quite likely that the notice of the proposed settlement was widely understood and intelligently considered by the class.

■ Of the approximately 1875 class members who received notice prior to January 19, 1979, some 125, or approximately 6%, objected to the proposed settlement. While this is by no means an insignificant percentage, it does appear that the vast majority of class members do not oppose the proposal. This court has considered carefully the objections raised by the class members, and concluded that the fears and

Clayton Act since they are not "injured in [their] business or property." 15 U.S.C. § 15 (1976).

12. The updated reports, submitted at the court's request after the January 19, 1979 hearing, are all unaudited.

dissatisfactions expressed [13] do not outweigh the practical and legal factors considered above, which strongly counsel the settlement as proposed. A settlement is not unfair or inadequate simply because a number of class members oppose it. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974), *reh. denied*, 420 U.S. 913, 95 S.Ct. 836, 42 L.Ed.2d 844 (1975), (district court did not abuse its discretion in approving settlement despite opposition of over 20% of class).

■ This court, having considered the strength of the plaintiffs' case vis-a-vis the difficulties of proof and the defenses they are likely to encounter at trial, the cost of additional litigation, the financial solvency of the defendants and the degree of opposition to the proposed settlement from members of the classes, concludes that the settlement as proposed is adequate. In fact it appears to be the only reasonable manner in which the plaintiffs' injuries might be satisfactorily compensated.

It appears that even if sufficient cash were available to recompense the plaintiffs, the certificates would be more valuable than cash. If the plaintiffs were compensated in money, their injury would necessarily be measured in pre-1977 dollars, their value eroded by inflation. The value of the certificates is established by current and ever-escalating real estate prices. Thus, inflation should work to the advantage of certificate holders. Counsel for the plaintiffs have supplied data which indicate that the average annual rate of appreciation of residential real property values in Montgomery County is 11%.[14] These figures indicate that the average loss to members of the plaintiff classes ranged from $565.00 in 1974 to $682.00 in 1976, while the average present value of a certificate is approximately $790.00, and in 1985, assuming constant appreciation at the same rate, the same certificate should be worth over $1,800.00. To the certificate holder with a house to sell in the greater Washington area,[15] this settlement practically insures that he will recover at least his actual damages, if not substantially more. To the class member who has left the area and must avail himself of the clearinghouse, recovery is less certain, since the holder may have to discount his certificate to attract buyers. All the same, it seems certain that there will be a lively market for certificates, and that people with expensive houses to sell will be the ones most likely to buy certificates from out-of-state holders. Accordingly, a holder who wishes to command a price for his scrip which reflects his actual damages will most likely be able to do so.[16] Thus, this court believes that the settlement

---

**13.** *See* page 313, *supra.*

**14.**

| Year | Number of Transactions | Aggregate Sales Price | Average Sales Price | % Annual Appreciation In Average Sales Price |
|---|---|---|---|---|
| 1970 | 3,944 | $140,780,000 | $35,695 | |
| 1971 | 4,902 | 196,005,000 | 39,985 | 12% |
| 1972 | 5,776 | 248,293,000 | 42,987 | 8% |
| 1973 | 5,530 | 281,820,000 | 50,962 | 19% |
| 1974 | 5,299 | 299,707,000 | 56,559 | 11% |
| 1975 | 6,237 | 378,137,000 | 60,628 | 7% |
| 1976 | 7,557 | 515,530,000 | 68,219 | 13% |
| 1977 | 9,352 | 672,751,000 | 71,937 | 5% |
| 1978 Oct. 31 | 8,871 | 693,680,000 | 78,998 | 10% |

Average Rate of Appreciation 11%

These figures were provided by the Montgomery County Multiple Listing Service.

---

**15.** It is estimated that over 60% of those class members who have been located continued to reside in the area.

**16.** It is agreed that certificate holders will be notified that they may consign their certificates to the clearinghouse at a price of their own choosing.

as proposed and amended is completely adequate to compensate the plaintiffs for their injury.

### C. Illegality: Anti-competitive Effect

It is obvious that no court may lend its approval to an illegal agreement or to one which has an illegal effect. *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). It is therefore necessary to determine whether the 5% scrip to be issued to class members represents a *per se* violation of the antitrust laws, or, if not *per se* anti-competitive, whether issuance of the certificates would have an anti-competitive effect on the relevant real estate market. Such an inquiry, of course, does not impose upon the court the responsibility of "trying" the case *ab initio. Id.* at 124.

The argument has been advanced not by any party but by competing real estate brokers, that pegging the value of the certificates at 5% constitutes pricefixing which is illegal *per se*. The certificates do not present a true price fix, however, since holders and realtors remain free to negotiate a rate higher or lower than 5%. The certificate merely establishes the holder's initial entitlement to a preferential rate as a means of making restitution to the victims.

The essence of the settlement agreement between the defendants and the plaintiff classes is that each brokerage firm is undertaking by this novel but practical means to restore each of its victim-clients to approximately his position before the wrongful acts. The fact that five firms are

undertaking to do so at the same time and upon the same terms is a mere reflection of the fact that all were members of the same conspiracy and are now faced with similar considerations. Although undoubtedly the agreement will affect prices between the parties, the court concludes that the agreement is one of restitution, not an agreement to fix prices and hence not a *per se* antitrust violation. There remains the issue whether the plan would effect an unreasonable restraint of trade. This court has concluded that it would not.

Although at the most, approximately 3300 certificates could be issued, it is more realistic to expect that under 2000 will be distributed.[17] The certificates entitle the holder to list at 5% any single-family dwelling in the greater Washington metropolitan area, with any realtor licensed in that area who agrees to honor the scrip.[18] The parties have provided information at the court's request which indicates that in suburban Washington, D. C. alone, there are well over 30,000 sales per annum of used single-family houses.[19] Exact figures for the District of Columbia itself are unavailable, since there is no Multiple Listing Service. Nevertheless, it appears that a conservative estimate would place the number of appropriate transactions per year at approximately 5,000 to 6,000.[20] Thus, in the affected geographical market, there may be expected in any given year between 1979 and 1985 at least 35,000 sales of used residential real property to which the certificates might be applied.

This means that in the unlikely event that all certificates are retired in the first year, less than 10% of the transactions in

---

17. At this writing, 1890 class members have been identified, located and notified.

18. *See* pages 314–315, *supra*. The area contemplated consists of the District of Columbia, Arlington and Fairfax Counties, Virginia, and Montgomery and Prince George's Counties, Maryland.

19. The total number of residential sales reported to the suburban boards of relators (new as well as used houses) was, in the years following the institution of this suit, as follows:

| | |
|------|--------|
| 1975 | 26,755 |
| 1976 | 29,786 |
| 1977 | 36,705 |
| 1978 | 44,161 |

20. The January 1979 issue of *Realtor* magazine, a publication of the Washington Board of Realtors, reported 11,788 deeds in 1977 and 9,535 in the first three quarters of 1978. The number of deeds, however, reflects transfers of non-residential properties and new residential property, in addition to used residential realty.

the relevant market would be affected. Given that fewer than 2000 certificates will in all likelihood be issued, and that the scrip remains good for nearly seven years, the actual market impact will be much less. Although it is not easy to predict the workings of the scrip proposal, the parties expect that roughly one third of the certificates will be retired by the end of the first two years of the negotiability period and two-thirds by the end of four years.[21] If this prediction is accurate, and a steady rate of redemption prevails, then, in the first two years, fewer than 700 certificates would be applied to sales of over 70,000 used residential real properties. The impact on the market, assuming the foregoing, would be an insignificant 1%.

██ Even contemplating the uncertainties injected into this prediction by the existence of the clearinghouse and the speculative market that may develop in the certificates, it does not appear to this court that the settlement as proposed and amended, which allows redemption throughout the greater Washington metropolitan area by any realtor wishing to participate will have an unreasonable anticompetitive effect.[22]

In sum then, this court concludes that the settlement proposed by the parties in this action is fair, reasonable and adequate and should, for the benefit of the class, be approved. In fact the court knows of no viable alternative acceptable to all parties and the court.

### Attorneys' Fees and Costs

The private settlement agreement provides in addition to the class relief described above, that the defendants shall establish a settlement fund of $350,000 to cover the costs of suit and plaintiffs' counsel fees. This fund is not to be applied to damages and it represents the maximum amount the plaintiffs may claim as costs and fees. The agreement provides that the court shall determine the amount to which plaintiffs' counsel are entitled. Any excess is to be returned to the defendants. Additionally, the defendants have agreed to pay the Attorney General's reasonable fees and costs.

The Attorney General has filed a petition for an award of $11,078.44 in fees and $3,917.13 in costs, for a total of $14,995.57. The defendants do not object to the reasonableness of this amount. Accordingly, the Attorney General's petition will be granted.

Counsel for the private classes have sought to recover what amounts to virtually the entire $350,000 fund. They claim costs of $16,208.12 and fees of $229,608.75 representing the number of hours spent at their normal hourly rate. They seek additionally to have the latter figure enhanced by a multiplier of 1.4 in recognition of the quality of their work and the contingency of the litigation, yielding a total fee award of $322,750.00. The defendants strenuously oppose an award of this size.

At the outset, it is appropriate to remark that counsel for all sides are fine attorneys of high standing in the legal community. Their work as revealed by the record has been of excellent quality. This is not, however, a case of enormous magnitude or complexity. Although there was some risk involved and some novel issues were raised, by and large, this has been an average civil antitrust matter.

---

21. The Attorney General's review provision contemplates this redemption rate. The court is advised that under a similar plan in a case in Minnesota (in which the certificates were not negotiable) *Forbes v. Greater Minneapolis Board of Realtors*, No. 4–72 Civ. No. 569 (D.Minn.), 62% of the outstanding certificates were retired in the first four years.

22. In reaching this finding, the court has been guided by the thoughtful assessment of the Assistant Attorney General charged with antitrust enforcement in Maryland. Initially he opposed the scrip proposal, reasoning that it would have an anticompetitive effect on the market which the Attorney General could not sanction. He was persuaded, however, by further investigation into the actual impact of the plan that its effect would be minimal, as the court has found. Although of course the court is not bound by the Attorney General's conclusion, in this case considerable deference is due the opinion of the State's chief antitrust prosecutor, whose experience and familiarity with the relevant market has been most helpful.

The determination of the amount to be awarded counsel for their labor in reaching a class action settlement is a matter committed to the discretion of the court. Although several factors have been identified to guide the court, *see, e. g., Manual for Complex Litigation*, § 1.47(b)(1) (1977), more useful than a mere listing of factors is the formula set out by the Third Circuit in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161, 167–68 (3d Cir. 1973) ("*Lindy I*"). This requires determining *first* the number of hours spent in what manner by what attorneys and *second* the value of the attorneys' services, generally reflected in their normal billing rate. *Third*, the court should consider the contingent nature of success and certain nonobjective criteria such as the quality of representation. *See also City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974) ("*Grinnell I*") and *Lindy Bros. Builders v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976) ("*Lindy II*"). The figure reached by multiplying the number of hours spent by the dollar value of the attorneys' time is referred to as the "lodestar." The court may, in its discretion, enhance the "lodestar" by a multiplier which reflects the risk and quality considerations.

Plaintiffs' counsel state by way of affidavits submitted in support of their fee petition that they have expended collectively 2,937.35 hours on this case. The defendants do not dispute the veracity of this assertion. Nevertheless, they do contend that the figure represents hours of duplicative and inefficient time which cannot form the basis for an award of reasonable attorneys' fees. This court, which has had the opportunity to observe counsel closely for approximately two years, does not agree. Without becoming "enmeshed in a meticulous analysis of every detailed facet of the professional representation," *Lindy II, supra* at 116, this court's recollection is that pleadings were filed and discovery conducted in an organized and efficient manner. Pretrial orders were prepared by one firm and circulated to the rest, and most conferences were conducted with only a few representatives of either side present. The affidavits reveal that senior partners have not wasted valuable time on matters better committed to associates or paralegals. In sum, it is this court's impression, borne out by counsel's affidavits, that plaintiffs' counsel have worked together cooperatively and responsibly, and their efforts have been neither redundant nor inefficient.

Accordingly, with the sole exception of time claimed by one firm for drafting the fee petition, the court accepts and credits the number of hours claimed and finds additionally the distribution of hours among the members of the firms to be appropriate.

The court will disallow recovery for hours spent by the firm of Dunnels, Duvall, Bennett & Porter in preparing the fee petition since this activity inures solely to the benefit of counsel, not to the class. *Clanton v. Allied Chemical Corporation*, 416 F.Supp. 39, 43 (E.D.Va.1976); *Lindy II, supra*, 540 F.2d at 111. This amounts to 16 hours spent by Mr. Bloomfield at $90.00 per hour, 2.50 hours spent by Mr. Green at $90.00 per hour, and 9.25 hours spent by Mr. Kriegel at $60.00 per hour. This reduces the total number of hours to be credited to 2909.60, and the lodestar dollar amount claimed to $227,388.75.

The second step is to determine whether the hourly rates claimed are reasonable. As contemplated by the court in *Lindy I*, counsel have valued their hours by reference to the normal hourly charge they bill their clients for comparable non-contingent work. The hourly rate charged by private counsel ranges from $150.00 for Mr. Cohen, a senior partner in Kohn, Milstein and Cohen to $50.00 for the work of various junior associates. Law clerks and summer associates billed at rates ranging from $10.00 per hour to $30.00, while work performed by paralegal staff was assessed at from $10.00 to $15.00 per hour. These amounts appear to this court to be within the acceptable range of reasonable fees. As noted, counsel are respected and able

members of the antitrust bar, and "bargain basement" rates of compensation would not be appropriate, *Pitchford Scientific Instruments Corp. v. Pepi, Inc.*, 440 F.Supp. 1175, 1177 (W.D.Pa.1977), or consistent with the "private attorney general" concept inherent in Clayton Act § 4 prosecutions.

Accordingly, the court will allow the plaintiffs' counsel to be compensated out of the settlement fund at their normal billing rates as set forth in their affidavits. The "lodestar" figure is thus fixed at $227,-388.75.

■ Counsel seek a multiplier of 1.4 in recognition of the quality of their performance and the risk they assumed in undertaking this litigation on behalf of the class. This court is of the opinion that while a multiplier reflecting the risk involved is justified, a multiplier for "quality" is not. "It seems redundant and unnecessary . . . to increase the hourly rate geometrically because of the quality of representation and the difficulty of the issues when those two factors have already been sufficiently accounted by the individual lawyer's normal hourly billing rate and the hours spent by him in preparation." *Manual for Complex Litigation*, § 1.47 at 69 (1977). *See also City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (2d Cir. 1977), *amended*, 575 F.2d 1009 (2d Cir. 1978) ("*Grinnell II*"). The rates which counsel normally charge, which this court finds to be "reasonable," reflect a high degree of skill and experience at the antitrust bar. "[A] consideration of 'quality' inheres in the 'lodestar' award: counsel who possess or who are reputed to possess more experience, knowledge and legal talent generally command hourly rates superior to those who are less endowed." *Lindy II, supra*, 540 F.2d at 117. There appear to be no special features in this case which warrant increasing the hourly rate on the basis of quality alone.

The risk factor, on the other hand, suggests that the award to plaintiffs' counsel might properly be enhanced. Counsel undertook the case on a contingent fee basis, and, as noted in considering the advantages of settlement to the plaintiff classes, suc-

cess was by no means certain at the outset. Even the defendants' criminal conviction did not substantially increase the private litigants' chances of succeeding. *See* page 316 *supra.*

■ The likelihood of success or "contingency" factor is to be measured at the time of filing suit, and generally requires the following considerations: (1) Analysis of the plaintiffs' burden; (2) Evaluation of the actual risks assumed by counsel in developing the case, and (3) Whether counsel have had to suffer a delay in the receipt of payment for services rendered. *Lindy II, supra*, 540 F.2d at 117.

(1) The question of the plaintiffs' burden demands a determination of (a) the factual and legal complexity of the case, (b) the probability of defendants' liability, and (c) whether damages would be easy or difficult to prove. *Id.* This case was filed after the defendants were indicted but before they were convicted. At that time, (a) the case was, and remained, one of medium complexity. (b) Although there was certainly a probability that the plaintiffs could establish liability, the (c) proof of causation and damages would be somewhat difficult. *See* page 316 *supra.* Accordingly, this court finds that plaintiffs' burden was quite heavy from the outset.

The burden was made heavier by the defendants' valiant and justified resistance. *See* page 310 *supra.* (2) Counsel for the plaintiffs have had to advance many hours as well as substantial out-of-pocket expenses on this case with no guarantee of remuneration. In addition, (3) their labor has gone uncompensated for over two years.

■ Having considered the foregoing criteria, this court finds that counsel for the plaintiffs assumed a substantial risk for the benefit of the classes they represent, and that the "lodestar" figure should accordingly be increased by a multiplier of 1.25. This yields an award of attorneys' fees in the amount of $284,235.93, to be paid out of the $350,000.00 fund set aside by the defendants for this purpose.

 Counsel for the private class have also sought to recoup their out-of-pocket costs to the date of the settlement hearing, that is, $16,208.12. These will be added to the fee award.

 It is apparent to this court that the amounts thus to be recovered by counsel are fair and well-justified. The total award of attorneys' fees and costs represents only a moderate percentage of the cash value of the settlement achieved for the benefit of the classes. The minimum dollar value of the settlement may be estimated by multiplying the number of identified class members (1890) by 1% of the average current price of a used house in Montgomery County today ($789.00): $1,419,210.00.[23] Thus, the total counsel fees and costs which are to be awarded out of the settlement fund, *i. e.*, $315,439.62, amount to between 20% and 25% of this minimum recovery estimate. Such a percentage would be unusually small in today's ordinary contingent fee case, nevertheless, it represents substantially more than counsel for the private class would have recovered on a strict hourly-fee basis. Most satisfactory of all is the fact that the award will in no way diminish the amount of recovery to the class members.

 Plaintiffs' counsel, and specifically the firm of Tydings & Rosenberg, have requested additionally that a supplemental fund be set aside to compensate their costs in administering the settlement. This includes the cost of preparing and mailing the certificates as well as the expense of communicating with class members concerning the administration of the clearinghouse, maintaining current addresses for class members, and assisting with complaints about the operation of the clearinghouse. The staff of this court has spent considerable time already answering inquiries from the class, and this court can well understand the need for an amount to be set aside to cover such expenses over the next seven years. Accordingly, the sum of $15,-000.00 will be set aside from the settlement fund against which attorneys may apply for fees for time expended in administering the settlement.

Finally, the settlement agreement provides that the trustees are to set aside $5,000.00 out of the settlement fund to reimburse the defendants for the cost of advertising and operating the clearinghouse. It should be obvious that the fair and efficient operation of the clearinghouse is essential to the viability of this settlement. Accordingly, as provided by the agreement, the sum of $5,000.00 will be set aside to cover the defendants' costs in operating the clearinghouse.

---

**23.** This figure is probably low, as it is based upon 1978 housing prices. *See* fn. 15 *supra*. It does not, of course, reflect prices in other counties where certificates may be applied, nor does it reflect either the built-in inflation factor

which inures to the benefit of the class or the fact that a class member is entitled to sell his certificate for as high a sum as the market will bear. *See* page 319 *supra*.