**TWIN CITY SPORTSERVICE, INC., a Missouri corporation, Plaintiff-counter-defendant-Appellant and cross Appellee.**

**and**

**Sportservice Corporation; a New York corporation, Counterdefendant-Appellant and Appellee.**

**v.**

**CHARLES O. FINLEY & COMPANY, INC., an Illinois corporation; Defendant-counterclaimant-Appellee and cross Appellant,**

**and**

**Charles O. Finley; Shirley M. Finley; Charles O. Finley, Jr.; Paul M. Finley; Sharon Kesling; and Kathryn Perlmutter, Defendants-Appellees cross Appellants.**

**Nos. 80–4196, 80–4233.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 14, 1981.

Decided May 10, 1982.

John P. Frank, Phoenix, Ariz., for Twin City Sportservice, Inc.

William G. Myers, Chicago, Ill., for Charles O. Finley & Co., Inc.

Before DUNIWAY and ANDERSON, Circuit Judges, and KELLEHER, District Judge.*

J. BLAINE ANDERSON, Circuit Judge:

## I. INTRODUCTION

This litigation began in 1967 when Twin City Sportservice, Inc. (Sportservice)[1] filed suit against Charles O. Finley & Company, Inc. (Finley),[2] seeking relief from Finley's alleged breach of its 1950 concession contract with Sportservice. Finley counterclaimed against Sportservice and its parent corporation, Sportservice Corporation (Sportservice), and alleged that the contract violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The contractual issues have long been decided in favor of Sportservice; however, issues involving the antitrust defense and counterclaims, twice decided in Finley's favor, are presently before this court for the second time.

The contractual and antitrust issues were originally bifurcated for trial before Justice Clark with Sportservice prevailing on its contract claims by judgment in 1970, and Finley prevailing on the antitrust defense and counterclaims in 1972. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 365 F.Supp. 235, 237–38 (N.D.Cal.1972). Sportservice appealed, and this court reversed Justice Clark's determinations of antitrust liability, remanding for the purpose of receiving new evidence directed toward the definition of the relevant market. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975) (*Finley I*). Upon remand, the district court (per Judge Peckham) received additional evidence regarding the relevant market pursuant to this court's instructions in *Fin-*

*ley I*, and again found for Finley on its antitrust claims. Sportservice now appeals from Judge Peckham's judgment for Finley, and Finley cross-appeals for application of interest from the date of Justice Clark's first judgment and for an increased attorney's fee award. In his last memorandum and order addressed to this litigation, Judge Peckham remarked, "We now conclude what should be the denouement in a long and tangled story." Shortly thereafter, that optimistic prediction of finality was frustrated by the present appeal. Although we reverse on issues regarding interest and attorney fees, our affirmance of Judge Peckham's findings and conclusions of antitrust liability compels us to affirm his additional conclusion that this indeed should be the denouement in this long and tangled story.

## II. RELEVANT MARKET

### A. *Prior Proceedings*

The protracted history of this litigation is due in large measure to the parties' dispute over the relevant market. At the first trial, Justice Clark concluded that the relevant market consisted of "major league baseball concessions." 365 F.Supp. at 245.[3] This court rejected such a market on prior appeal for basically two reasons: (1) it erroneously focused upon the concessionaire as the seller of concession services and the baseball club or facility as the buyer—rather than considering the concessionaire as the buyer of a concession franchise and the baseball club or facility as the seller of such a franchise, and (2) it was erroneous in scope in that it was limited to concession franchises associated with major league baseball, excluding other franchises associated with

---

* The Honorable Robert J. Kelleher, United States District Judge for the Central District of California, sitting by designation.

1. Throughout this opinion, "Sportservice" refers to both Twin City Sportservice, Inc., and its parent corporation, Sportservice Corporation.

2. By order of October 14, 1981, the noncorporate appellees and cross-appellants were added to this litigation. Throughout this opinion,

"Finley" shall refer to all appellees and cross-appellants.

3. The parties and prior courts agree that the relevant geographic market in this case is national. While we confine our terminology to "relevant market," in other contexts, it would more appropriately be referred to as the relevant product market to distinguish the analysis from geographic market.

other facilities and events. *Finley I,* 512 F.2d at 1272. However, our rejection of Justice Clark's market was accompanied with instructions to the district court on remand. *Inter alia,* the district court was instructed that:

> "[T]he relevant market with which we are concerned here is one in which the articles of commerce are franchises, not concession services. . . .
>
> . . . .
>
> . . . [A] concessionaire is a buyer in the franchise market and a seller in the concession market. . . .
>
> . . . .
>
> It follows that the relevant franchise market cannot be limited to those offered for sale by major league baseball teams. . . .
>
> . . . .
>
> . . . The franchise market with which the trial court should be concerned on remand of this case is that which envisions the sale by the concessionaire of a limited range of concession items to spectators in a closed area, either by vendors, stands, or both, where the preparation requires at most a grill and not a kitchen. The leisure time activities with respect to which franchises within the relevant market are available are undoubtedly numerous. They may include all or a substantial number of the following: *viz.,* football, basketball, hockey, soccer, boxing, racing, track and field, rodeos, circuses, and music festivals. Likewise the sellers of such franchises may include professional teams, sports organizations and public and private operators of stadiums, arenas, race tracks, convention centers and amusement parks."

In summary, this court furnished the district court with two additional guidelines:

> "We conclude these guides to the trial court by observing that in establishing the relevant franchise market the trial court (1) should apply the test of reasonable interchangeability and (2) should treat the leisure time activity or facility manager as the seller of the franchise and the concessionaire as the purchaser."

512 F.2d at 1272–74.

With this guidance, the district court, on remand (per Judge Peckham), received additional evidence and found a new relevant market by performing a two-part analysis. The court remarked:

> "In sum, the task which emerges from these guidelines has two steps. First, the court must determine what facilities, considered in terms of the techniques and skills of their concession operations, are reasonably interchangeable with major league baseball franchises. This substitutability of production in the concession products market defines the outer limits of the franchise market. Second, the court must determine which franchises within these outer boundaries are found by national concessionaires to be reasonably interchangeable in use."

March 31, 1977 Memorandum and Order, at 7–8.

The result of the district court's first step, an analysis of substitutability of production in the concession products market, defined the broad "outer limits" of the possible market as consisting of "stadiums with major league baseball and/or football, arenas with major league basketball and/or hockey, arenas without major league sports, auto racing tracks, and certain amusement parks."[4] March 31, 1977 Memorandum and Order, at 11. The result of the second step, an analysis of the substitutability of use in

---

4. The district court eliminated a number of facilities and activities that had been suggested by this court on prior appeal to be in the possible zone of production substitutes. *See,* 512 F.2d at 1274. The district court concluded that boxing, soccer, rodeos, circuses, music festivals, and track and field events take place in facilities already considered to be within the zone of production substitutes and that these facilities "generally do not offer a separate and additional franchise for their concession operations." March 31, 1977 Memorandum and Order at 10. The court also noted that fairs do not usually offer the type of concession franchise at issue in this litigation, and that "horse racing, dog racing, and convention centers all must be excluded because the use of a kitchen for providing full dinners is an important part of their operation." *Id.*

the concession franchise market, yielded a total of 118 possible concession franchises within the relevant market. Of that number, the district court below found that Sportservice controlled 24 percent.[5]

### B. *Arguments on this Appeal*

■ Sportservice attacks the post-remand definition of the relevant market on many specific fronts, but its general argument is that the district court, on remand, failed to adhere to this court's instructions in *Finley I.* Sportservice reads our instructions as explicitly defining the types of facilities and categories of events that should be included in the relevant market, leaving the district court with the sole obligation of finding the correct numbers. Finley, on the other hand, reads this court's instructions on prior appeal as more general guidelines fully supporting the district court's actions in finding the new relevant market. We agree with Finley.

On prior appeal, we reversed and remanded because a market limited only to major league baseball concession franchises was deemed too narrow. We instructed the district court to supplement the record with evidence of concession franchises that were reasonably interchangeable with the type of franchise serving major league baseball teams. This court intended for the district court to resume its inquiry into the possible addition of concession franchise opportunities which would comprise a more reasonable relevant market under the facts of this case. Our prior opinion did not specifically define the types of events and facilities in the relevant market, nor did it determine the number. Our prior decision stated only that a focus on major league baseball was too narrow, that that focus had resulted from Justice Clark's emphasis upon the market for the sale of concession services rather than the concession franchise market as the relevant line of commerce, and from his failure to examine the franchise market for which reasonable interchangeability among concessionaires like Sportservice existed.

■ Sportservice appears to have little difficulty with the district's court's initial narrowing of the concession franchise market performed by the first step of finding those concession franchises for which substitutability of production in the concession products market exists. Such a narrowing is proper. *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 691 (9th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). Sportservice does take issue with the district court's second narrowing—the determination of reasonable interchangeability in use or demand by national concessionaires among the concession opportunities left after the first paring. As discussed, the district court, on remand, performed the second step by narrowing the market to only those concession franchise opportunities for which we could reasonably expect to find competition among national concessionaires—concessionaires competing with Sportservice. The district court performed the second step by essentially adopting the minimum gross receipts requirements offered by Finley's expert witness, Mr. Vincent Pantuso, an executive with a competing national concessionaire, Interstate United Corporation. It is the use of the Pantuso testimony and the resultant market exclusions that form the specific contentions of Sportservice on this appeal. Because we feel that it was reasonable for the district court to have used the Pantuso testimony in establishing the relevant market in this case, we need not discuss Sportservice's arguments concerning the exclusion of "satellite" or "proximate" concession

---

**5.** This market control figure of 24% compares with a finding of 50% control of the major league baseball concession market after the first trial. *See,* 365 F.Supp. at 250. The 24% figure represents the result of a "weighted" calculation of Sportservice contracts by doubling the number of those held by Sportservice at major league baseball facilities. This weighting was performed pursuant to evidence submitted that major league baseball concession franchise revenues average twice that of other major league sports concessions.

franchises, nor the exclusion of college football concession franchises.[6]

■ Sportservice contends that the district court placed undue emphasis upon the testimony of Mr. Vincent Pantuso who testified that, in his opinion, a national concessionaire would not seek out a concession franchise that yielded less than $25,000 annually in net profits or produced less than $250,000 annually in gross receipts. Sportservice argues that this testimony was the basis for the district court's narrow delineation of the relevant market; that Mr. Pantuso's opinion as to the threshold dollar factors used by national concessionaires is not shared by all national concessionaires; and, by relying upon this testimony, the district court incorrectly applied the tests for relevant market that were stated by this court on prior appeal. We disagree.

■■ We do not think that the law of this case or antitrust law, in general, constrained the district court to the extent asserted by Sportservice on this appeal. We note that "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510, 542 (1962). It is correct, as Sportservice argues, that this court did not explicitly dictate that the market in this case be limited to concession opportunities which would attract only national concessionaires. However, we did not preclude such a conclusion after evidence was received on remand that such was a reasonable view of the facts and circumstances related to this litigation. Similarly, we did not dictate that the district court receive evidence of minimum dollar volume figures to determine a competitive threshold for which concession franchise operations are reasonably interchangeable with major league baseball concessions, but we did not preclude such testimony. In view of the record now before us, we think Mr. Pantuso's profitability and gross receipts tests offered a reasonable approximation of the size of concession franchise opportunities for which there is realistic competition in the concession franchise market.[7] The definition of the relevant market is basically a fact question dependent upon the special characteristics of the industry involved and we will not disturb such findings unless clearly erroneous. *See, Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 915 (10th Cir. 1975), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1976); and *Sulmeyer v. Coca-Cola Company*, 515 F.2d 835, 849 (5th Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976). For the reasons expressed herein, we hold that the district court's finding of the relevant market is not clearly erroneous.

■■ Although the search for the relevant market is basically a factual inquiry, it deserves noting that the district court also properly followed precedent in this area by restricting the relevant market to one in wherein commercial reality exists. In defining a relevant market for Sherman Act purposes, the court must consider distinction in degree as well as kind. *International Boxing Club v. United States*, 358 U.S. 242, 251, 79 S.Ct. 245, 250, 3 L.Ed.2d 270 (1959); *United States v. Grinnell*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Sportservice argues that "[t]he record requires a finding that the relevant market includes all of those types of facilities which sell or can sell franchises for concession products prepared with at most a grill and not a kitchen." In support of this definition, Sportservice proceeded to prove

---

6. The record indicates that the satellite concessions and college football concessions do not produce sufficient income in order to meet the Pantuso threshold tests; thus, our affirmance of the district court's findings of the relevant market, using the threshold tests, supports the district court's exclusion of satellite and college football concessions.

7. In addition to the Pantuso testimony, the record indicates that Mr. Richard P. Komen, who represented himself as manager of Volume Service Company in 1971 when he testified before Justice Clark, affirmed that he also used a $250,000 gross sales threshold figure to determine whether his company would be interested in obtaining a concession franchise.

the number of facilities and events of the type described, and, by use of a marketing report and a survey performed for this litigation, Sportservice argues that it controlled only 4 percent of the above-described types of concession events and facilities during the relevant period. Such a definition and estimate of market foreclosure simply ignores commercial reality. In order to abide by the dictates of *International Boxing Club* and *Grinnell*, and determine where "meaningful competition" exists, *United States v. Continental Can Co.*, 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964), it was appropriate for the district court to have narrowed the relevant market to those concession franchises for which reasonable substitutability in demand among national concessionaires can be found. The artificially large relevant market proferred by Sportservice lacks the above characteristics. Sportservice's attempt to have this court adopt a relevant market of 2,000 to 11,000 concession franchises fails because such a market simply does not represent an estimate of meaningful competition. It makes no effort to group concession franchises by size of operations or profitability—two characteristics found by the district court to be especially relevant given the national concessionaire's typical economies of scale. The record in this case amply supports the district court's finding that effective competition was limited to the 118 concession franchises comprising the relevant market.

■ It is also worth noting that the effort to find a relevant market in this litigation was not performed without purpose. A definition of a relevant market was necessary in order to assess possible Sherman Act violations. As for the determination of a Sherman Act section 1 violation, an unreasonable restraint of trade, this court sanctioned the use of the tests stated in *Tampa Electric Company v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). That case sets out a three-part test: (1) a determination of the line of commerce involved, (2) a determination of the "area of effective competition," and (3) a determination of whether competition has been foreclosed in a substantial share of the relevant market. *Id.*, 365 U.S. at 327–29, 81 S.Ct. at 628–29, 5 L.Ed.2d at 587. We noted in *Finley I* that the first two tests basically outline a determination of the relevant market. *See* 512 F.2d at 1275. We note here that a finding of the "line of commerce" is not significantly different from the first narrowing performed by the district court below. Substitutability in production, while a more technical term of art, is another way of describing the analysis required by the first *Tampa Electric* test, that of broadly defining the type of business engaged in by competitors in the concession franchise industry. The line of commerce for this case was found to be concession products sold to people in a closed area where preparation of the products requires at most a grill and not a kitchen. *See Finley I*, 512 F.2d at 1274. Although Sportservice would have the analysis begin and end with this definition of the line of commerce, *Tampa Electric*, as well as other authorities, dictate further inquiry—we must search for the "area of effective competition" within this line of commerce.

This second inquiry does not significantly differ from the district court's second paring of the market in the instant case. The district court found that effective competition existed only for concession franchises that a national concessionaire would find profitable by reason of dollar volumes. The record amply supports the district court's finding that effective competition did not encompass every concession franchise within the relevant line of commerce. In our minds, an analysis of substitutability in demand or use of franchises in the concession franchise market is another way of describing a method used to test for the area of effective competition under *Tampa Electric.* The district court, therefore, properly applied the first two *Tampa Electric* tests in its finding of the relevant market.

■ In conclusion, we affirm the district court's finding of the relevant market below. We feel it is reasonable given the

post-remand record, that it accurately applies the instructions of this court on prior appeal, and that it is supported by fact and case law. Moreover, substantial evidence supports the district court's finding that Sportservice controlled 24 percent of the relevant market.

## III. SUBSTANTIVE LIABILITY

### A. *Prior Litigation*

After the first trial in this case, Justice Clark concluded that Sportservice had committed four separate antitrust violations: (1) an unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (2) an attempted monopoly of the relevant market in violation of section 2 of the Sherman Act, 15 U.S.C. § 2; (3) a *per se* violation of section 1 of the Sherman Act, 15 U.S.C. § 1, resulting from an illegal tying relationship between Sportservice and its franchisors; and (4) a market foreclosure constituting a monopoly in violation of section 2 of the Sherman Act, 15 U.S.C. § 2. *See, Twin City Sportservice v. Charles O. Finley Co., Inc.,* 365 F.Supp. 235, 252–54 (N.D.Cal.1972).

In *Finley I,* this court reversed all of the above legal conclusions of liability, and specifically held that no per se tying violation could be found from the facts presented in the record. 512 F.2d at 1275–76. The district court immediately below (per Judge Peckham) determined that Sportservice's share of the relevant market was not sufficient to support an actual monopolization claim. Finley does not appeal from this ruling. Thus, with the actual monopoly and the tying claims eliminated, this appeal focuses only upon the first two violations stated above; i.e., whether the trial court below erred in finding an unreasonable restraint of trade in violation of section 1 of the Sherman Act and an attempted monopoly in violation of section 2.

### B. *Restraint of Trade Violation—Sherman Act Section 1*

After redefining the relevant market, Judge Peckham below found that Sportser-

vice's competitive position in the relevant market, brought about through Sportservice's ability to procure contracts similar to the one involved in the instant case, constituted an unreasonable restraint of trade in the relevant concession franchise market. Judge Peckham determined that an unreasonable restraint of trade had been evidenced not only by Sportservice's 24 percent share of the relevant market, but also from its continuing pattern of conduct that produced that market share. The district court pointed to evidence of Sportservice's consistent pattern of obtaining contracts of unreasonable duration, often coupled with the use of "follow-the-franchise" clauses and, in many cases, the predatory use of its financial strength to obtain its favorable concession franchise agreements. The district court concluded, "[The long-term franchise contracts] represent classic examples of artificially created barriers to effective entry into and competition within the market."

With the district court's conclusion of section 1 liability, Sportservice raises the following issues: (1) that exclusive-dealing antitrust case law does not apply to this case, (2) that the district court improperly aggregated all of Sportservice's contracts in the relevant market in finding a section 1 violation, (3) that the district court did not perform a rule of reason analysis, and that the district court's determination of section 1 liability places this case in conflict with an alleged trend in the law of franchise contracts which promotes long-term contracts, and (4) that certain findings of the district court were either unsupported by the record or clearly erroneous. We disagree and affirm the district court's conclusion of section 1 liability for the reasons expressed below.

#### 1. *Applicability of Exclusive-Dealing Case Law*

Sportservice argues that its contract with Finley is not a "typical" exclusive-dealing arrangement, thus questioning the district court's use of exclusive-dealing antitrust case law, specifically, *Tampa Electric, su-*

pra, in evaluating its section 1 violations. It argues that the case law is inapposite because *Tampa Electric* and other exclusive-dealing cases involve questions of the propriety of the exclusivity *per se* of arrangements, while the exclusivity of the arrangement involved in Sportservice's concession franchises is not an issue in this case. The problem with using the exclusive-dealing cases, Sportservice continues, is that the district court in this case found a violation solely on the basis of the length of the contract with Finley, not its exclusivity. This argument is devoid of merit.

█ First, this court sanctioned the use of the tests started in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), an exclusive-dealing case, to determine whether Sportservice's conduct evidenced a violation of section 1 of the Sherman Act. *See* 512 F.2d at 1275. Sportservice raised no contention on remand with this determination, and Sportservice's argument on this appeal does not persuade us to deviate from the instructions we gave the district court in *Finley I*. The focus of the tests in *Tampa Electric* is to first find a relevant market and then assess whether competition has been foreclosed in a substantial share of the relevant market. The purpose of the tests clearly is to determine the anticompetitive effects of exclusive-dealing arrangements. The tests are therefore applicable whether the specific issue involves exclusivity *per se*, or whether it involves, as in this case, the methods used to procure exclusive contracts and the nature and extent of the anticompetitive influence of these contracts on a substantial share of the relevant market.

█ Second, we do not confine our analysis to only the Finley-Sportservice contract, *see* section III.B2, *infra*, nor do we confine it to the finding of unreasonable contract length. As pointed out, the district court found a section 1 violation from Sportservice's market share and its conduct in achieving that share through the use of unreasonably long concession franchise agreements, follow-the-franchise clauses, and predatory cash loans and advances.

Sportservice oversimplifies the district court's rulings by arguing that it simply holds contracts of greater than ten years' duration to be a violation of section 1. We affirm the district court's conclusion that a section 1 violation was presented by the evidence for all of the reasons expressed by the district court, not simply that the contracts were too long. For the above reasons, Sportservice's attempt to distinguish the facts of this case from the other exclusive-dealing cases fails.

### 2. The One Contract, Aggregation Issue

Sportservice argues that it was improper for the district court to have aggregated other contracts in the relevant market with the Finley-Sportservice contract to determine Sportservice's antitrust liability; that the district court should be limited to looking only to the one contract between Finley and Sportservice; and if such were done, the evidence shows that Sportservice controlled less than one percent of the relevant market. To support its argument, Sportservice cites to a number of cases which hold that various private antitrust plaintiffs in various factual contexts do not have standing to assert antitrust violations that affect them only indirectly.

█ Reliance on these cases is misplaced; indeed, reliance on a standing argument misconceives the issues in this case. The issue here is not whether Finley has standing to complain of Sportservice's antitrust violations; there is no question that Finley suffered a direct injury from Sportservice's conduct. Instead, the issue is whether a district court, in assessing the antitrust liability of a defendant, may look to the overall effects of a defendant's conduct in the relevant market, or is limited to looking at the market implications of the one contract between the antitrust plaintiff and defendant. At least in the factual context of the instant litigation, we think the district court correctly assessed Sportservice's aggregate pattern of conduct in the relevant market.

In *Fortner Enterprises v. U. S. Steel Corp.* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), the Supreme Court sanctioned the use of aggregation analysis in a case involving an alleged tying violation, stating:

> "[A] narrow focus on the volume of commerce foreclosed by the particular contract or contracts in suit would not be appropriate in this context. As the special provision awarding treble damages to successful plaintiffs illustrates, Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition."

*Id.,* 394 U.S. at 502, 89 S.Ct. at 1258, 22 L.Ed.2d at 504. We feel that the policy for allowing aggregation as expressed in *Fortner* equally applies to the instant case.

Sportservice admits that the government may sue on aggregate anticompetitive conduct, *see, e.g., Standard Oil Co. of California and Standard Stations, Inc., v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (*Standard Stations*), but offers little justification for us to adopt a limitation on private antitrust plaintiffs. We decline to formulate any distinction between public and private antitrust plaintiffs here for the same reasons expressed by the district court below. Creating such a distinction would require courts to enforce arguably innocuous single contracts that belong to a pattern of contractual relations that significantly restrain trade in a relevant market. Moreover, we support the district court's citation to other case authority allowing private plaintiffs to litigate anti-

trust defendants' aggregate pattern of allegedly illegal behavior.[8]

Sportservice also asserts that the law of this case supports its no aggregation argument. On prior appeal, we said that it was "necessary to establish the proper relevant market before it can be determined whether a particular exclusive-dealing arrangement unreasonably restrained competition in a substantial share of that market." 512 F.2d at 1274–75. Sportservice would emphasize the word "particular" to reinforce its one contract argument. We read that language differently. It is consistent with *Finley I* to look at Sportservice's total arrangement of entering into concession contracts with the facilities owners on an aggregate basis in order to determine Sportservice's antitrust liability. Nothing in our prior opinion suggested that aggregation of Sportservice's contracts in the relevant market was prohibited, and we find no compelling reasons to adopt such a principle at this juncture. We therefore hold that it was proper for the district court to have aggregated Sportservice's contracts in the relevant market in order to assess the Sherman Act violations resulting from these contracts.

### 3. Rule of Reason Analysis

#### a. General Application of the Rule

■ Sportservice argues that Judge Peckham did not apply or that he incorrectly applied the rule of reason when he concluded that Sportservice had violated section 1 of the Sherman Act. The record fails to support this contention.

We recognize that an exclusive-dealing arrangement does not constitute a *per se*

**8.** In addition to *Tampa Electric, supra,* and *Fortner,* the district court cited a number of cases wherein aggregate market activity was looked at in assessing antitrust violations. These include: *Cornwell Quality Tools Co. v. C.T.S. Co.,* 446 F.2d 825 (9th Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 715, 716, 30 L.Ed.2d 740 (1972) (action by tool distributor against tool manufacturer for alleged violations of section 2(a) of the Robinson-Patman Act and others); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) (action by

lessee and dealer of petroleum products against oil company for alleged violations of Sherman and Clayton Acts from oil company's dealings with its dealers). Even though the issue may not have been raised in these other cases, we find that the above cases support the district court's conclusion that aggregation of market contracts and activity in assessing various antitrust violations is understood. Sportservice's attempts to distinguish the cases focus on insignificant distinctions between the above cases and the instant case which we reject without elaboration.

violation of section 1, *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961);[9] *Brown v. Hansen Publications, Inc.*, 556 F.2d 969, 970 (9th Cir. 1977). Therefore, any particular exclusive-dealing arrangement does not violate section 1 unless it is found to be unreasonable. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Ron Tonkin Gran Turismo v. Fiat Distributors*, 637 F.2d 1376, 1381 (9th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). The reasonableness inquiry asks whether the restraint in question "is one that promotes competition or one that suppresses competition." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637, 650 (1978), *quoting, Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918).

First, it deserves mention that Judge Peckham below expressly applied the rule of reason. After concluding that Sportservice's contracts demonstrated anticompetitive effects, the district court considered whether the contracts nonetheless were justifiable or reasonable. Employing the tests in *Standard Stations, supra*, Judge Peckham concluded that the Sportservice concession franchise contracts in the relevant market created entry barriers into that market which foreclosed competition in an unjustifiable manner.

Sportservice feebly argues that the record does not demonstrate a foreclosure of competition, and insists that competition has flourished during the period in which it has controlled a quarter of the relevant market. To the contrary, the record suggests that both franchisors and concessionaires have been foreclosed from competition in the relevant market. It is difficult to see how Sportservice's pattern of capturing lengthy concession franchises (many of them in the lucrative major league baseball market) has promoted competition in the concession franchise market. The magnitude of Sportservice's concession franchise contracts, coupled with their considerable length, have had the opposite effect: they have locked up a large portion of the concession franchise market for many years, placing a significant amount of potential concession business beyond the grasp of any competitors. This much both district courts recognized.

The district court below also disputed Sportservice's proffered justifications for the length of the contracts. The evidence indicates that the length of the contracts is not necessary to recapture investments made in the contracts, *see* 365 F.Supp. at 250. Also, the district court could find no justification for the manner in which Sportservice used the follow-the-franchise clauses. The district court concluded that the "frequent use [of follow-the-franchise

---

9. *Tampa Electric, supra*, involved a challenge to a requirements contractual arrangement under both section 3 of the Clayton Act, 15 U.S.C. § 14, and sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. The Court limited its discussion to the application of section 3 of the Clayton Act and concluded that:

"even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric, supra*, 365 U.S. at 327, 81 S.Ct. at 628, 5 L.Ed.2d at 586–87.

The Court did not reach the plaintiff's Sherman Act section 1 claim, noting that it was unnecessary to do so since the exclusive-dealing arrangement in *Tampa Electric* did not violate the broader proscriptions of section 3 of the Clayton Act. The Court in *Tampa Electric* held that before a Clayton Act section 3 violation can be found, lower courts must determine whether exclusive-dealing arrangements have the requisite anticompetitive effect upon a substantial share of the relevant market. The anticompetitive impact, *vel non*, of conduct challenged under section 1 of the Sherman Act is also the focus of the rule of reason analysis. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637, 650 (1978). We therefore read *Tampa Electric* to support the conclusion that exclusive-dealing arrangements challenged under section 1 of the Sherman Act cannot be considered as *per se* violations. In so concluding, we reiterate what was said in *Finley I* that a greater showing of anticompetitive effect is required to establish a Sherman Act violation than a section 3 Clayton Act violation in exclusive-dealing cases. *See Finley I, supra*, 512 F.2d at 1275.

clauses] by Sportservice in tandem with long contract terms has served to bind many teams and facilities that were not primary parties to such transactions." Suffice it to say that the record is virtually silent as to any pro-competitive effects of Sportservice's conduct with respect to these concession contracts.

Sportservice cites to *American Motor Inns v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975), asserting that the district court did not properly follow the rule of reason. Sportservice apparently argues that a restraint of trade under the circumstances of this case should not be judged under the "least restrictive alternative" test, *see Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 51 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), but under the less burdensome "fairly necessary under the circumstances" test as directed in *American Motor Inns, supra.* We need not decide which of the tests should apply here, or even whether this court recognizes the difference, since the evidence in this case does not even show that the contract terms were fairly necessary under the circumstances; they were unreasonably long and unreasonably restrictive in preventing franchisors from dealing with other concessionaires and in preventing other concessionaires from dealing with the franchisors party to the agreements.

Finally, Sportservice argues that it should not suffer for contracts which are common in the industry. There is insufficient evidence in the record to verify Sportservice's claim here (it can only point to four such contracts of competitors with terms that approximate the prevailing term of Sportservice's contracts), and even if there were such evidence, an industry-wide practice would not justify what has clearly been shown to be unjustifiably anticompetitive. We therefore find no problem with the district court's adherence to and application of the rule of reason in making its determination below.

### b. Conflict with Franchise Contract Law

As further evidence of the district court's noncompliance with the rule of reason, Sportservice contends that the district court's finding of a section 1 liability puts the Sherman Act into "novel" conflict with the law of franchises. In particular, Sportservice directs our attention to a trend in the law of franchises where courts have upheld long-term franchise agreements in the face of terminations or non-renewals of agreements by franchisors.[10] Throughout its brief, Sportservice maintains that it is no different from the typical franchisee of the many fast food franchises operating in this country,[11] and apparently would have us

10. Sportservice cites *Shell Oil v. Marinello*, 120 N.J.Super. 357, 294 A.2d 253 (1972), *aff'd*, 63 N.J. 402, 307 A.2d 598 (1973), *cert. denied*, 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974) (action involving interpretation of a lease and a dealer agreement entered into between major oil company and one of its service station operators, and a determination of the extent of the oil company's right to terminate the lease and agreement with only ten days' notice), and *Atlantic Richfield v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978) (action by service station operator against oil company seeking to void contract provision providing for termination at will); and *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir. 1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980) (action by service station dealer against oil company alleging, *inter alia*, that oil company breached its fiduciary duty owed to dealer by terminating lease without good cause). The public policy thrust of each of these decisions is stated aptly in *Marinello* :

"Viewing the combined lease and franchise . . ., it becomes apparent that Shell is the dominant party and that the relationship lacks equality in the respective bargaining positions of the parties."

307 A.2d at 601. Sportservice transforms the holdings of these contract cases into an argument that would support the length of its concession franchise agreements. These cases are not only inapposite in subject matter and policy considerations, they are also totally irrelevant to the consideration of the anticompetitive effects of lengthy contracts under the circumstances of this case.

11. At one point in its brief, Sportservice contends that it does "nothing more or less than acquire a franchise to sell fast food items at a particular location" not unlike "McDonald's, Kentucky Fried Chicken, Pizza Hut, Taco Bell, Burger King, Dairy Queen and others." As discussed in the body of this opinion, this purported analogy exists, if at all, only superficially.

believe that affirming the district court's finding of section 1 liability would seriously impair the contracting abilities of some of the major fast food franchisors by restricting franchise contract length. This novel argument concerning the "novel" conflict with the law of franchises does not impress us.

■ First, we fail to see the analogy between a major national entertainment events concessionaire like Sportservice and the typical small businessman who owns the exclusive right to use a fast food trademark under a franchise agreement with a major national franchisor. The typical franchised fast food operation bears little resemblance to Sportservice's operations in either product line or competitive market conditions. While the fast food franchisee competes in an open market among many operators (including intra-brand competitors) who sell items for which there exists recognized cross-elasticity of demand for many different types of food products, Sportservice's operations, by comparison, constitute monopolies for the sale of a limited menu of items of its choosing to a closed, contained market with no sales competition from others (either inter- or intra-brand). Although the exclusive nature of Sportservice's right to sell concession items at a particular event or facility is not the subject of the antitrust inquiry in this case,[12] the monopolistic feature of a typical Sportservice concession franchise and others included in the relevant market in this case cannot be ignored in defining differences between Sportservice and the franchisees it seeks to be associated with in its argument here.

■ Even were we to accept Sportservice's proffered analogy, the policies promoted in the state law cases cited by Sportservice for the proposition that courts are protecting the length of franchise agreements do not apply to Sportservice. The equitable policies expressed in the cases cited which protect small business franchisees against contract termination by large franchising companies simply do not transfer to the facts of this case. If there were any disparity in bargaining power between Sportservice and its franchisors in the relevant market, the record indicates that Sportservice, as franchisee, most often possessed the superior bargaining position.

Moreover, Sportservice once again overemphasizes the district court's conclusion of unnecessary contract length in the Sportservice franchise agreements with its argument that courts are protecting franchise contract length. We reiterate that the district court below considered a number of factors in finding a section 1 violation in this litigation. As evidence that Sportservice's anticompetitive conduct was unreasonable, the district court also focused upon the suspect use of Sportservice's vast financial resources and the customary inclusion of follow-the-franchise provisions in its agreements. Contract length is but one of many considerations figuring into the district court's conclusion. We are inclined, as was the district court, to avoid a concentration only upon the unreasonable length of Sportservice's contracts.

Finally, no party in the franchise law cases cited by Sportservice raised any claim that the amassing of a number of franchises foreclosed competition in a relevant market as Finley raises in the present litigation. In order for the Sportservice's franchise law cases to be even remotely analogous to the facts of this case, those cases would have to involve claims that a particular defendant owned or controlled such a large number of lengthy franchises in a relevant market that such defendant threatened to restrain competition in violation of antitrust law.

---

12. The district court below noted that the exclusivity, *per se*, of the concession franchise agreements was not at issue and that the parties agreed that the exclusive arrangement is the only practical way to conduct the business of concession sales at the events and facilities involved. We will adhere to this stipulation of sorts and only add that we make no judgment as to the propriety of the exclusive nature of the franchise agreements. We do sense a certain irony about this, however. While our decision here may promote competition in the concession franchise . market, the unchallenged pragmatic monopolies created by these exclusive agreements will probably prevent this decision from having much effect upon the price of the spectator's next hot dog.

The cases cited by Sportservice focus instead upon the narrow issue of whether one particular franchise agreement should be terminated with cause or otherwise. Based on the foregoing, we emphatically reject any notion that our affirmance of the district court's conclusion of section 1 liability will disturb present agreements or impair prospective dealings between fast food franchisees and franchisors.

### 4. Factual Findings

Sportservice asserts that certain findings of fact made by Judge Peckham regarding the section 1 violation were either erroneous or unsupported by the record.[13] The record contains sufficient support for the findings, and we are bound to uphold them unless clearly erroneous. Fed.R.Civ.P. 52(a); *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1351 (9th Cir. 1982).

■ Sportservice first attacks the district court's finding that without significant exception, Sportservice's exclusive concession franchise contracts run for 10 years or more. This is a frivolous contention as the evidence clearly supports Judge Peckham's finding on this matter.

■ Second, Sportservice asserts that there is some contradiction in the district court's findings that the lengths of Sportservice's contracts do not vary in relation to the size of initial investment and that the experience of other concessionaires proves that adequate recoupment of investment may be made over much shorter periods. There is nothing inherently contradictory about the two findings, both are supported by the evidence, and neither can be considered clearly erroneous. Nor do we feel, as Sportservice suggests, that our affirmance will dictate that concession franchise contract length cannot exceed ten years. Such a conclusion is once again a simplistic view of the district court's ruling. The district court did not set out to announce an upper limit to franchise contract length and the effect of its ruling does not accomplish that purpose. The district court did hold, and we affirm, that Sportservice's pattern of conduct in the relevant concession franchise market imposed anticompetitive restraints. As previously discussed, our deci-

**13.** Sportservice takes issue with six findings of fact that were made by Judge Peckham in his application of the rule of reason as suggested in *Standard Stations, supra,* 337 U.S. at 308, 69 S.Ct. at 1059, 93 L.Ed. at 1383, which involves an inquiry into the degree to which "competition has flourished" despite the anticompetitive restraints of the contracts at issue, ·"the conformity of the length of their term to the reasonable requirements of the field of commerce in which they were used," "the status of the defendant as a struggling newcomer or an established competitor," and, most importantly, the "defendant's degree of market control . . . ." *Id.*

Also, Judge Peckham's analysis was performed with the use of the evidence entered before Justice Clark, together with evidence from the post-remand proceedings. Judge Peckham discussed his stance regarding the viability of the fact findings made during the first trial by Justice Clark:

"The parties are in dispute as to what findings of Justice Clark remain viable and effective after the Ninth Circuit's reversal of his relevant market and consequent liability holdings. We are of the opinion that specific findings of fact concerning the histories of this and other Sportservice baseball contracts, 365 F.Supp. at 245–49, and conclu-

sions of law concerning the reasonableness of these contracts, 365 F.Supp. at 249–51, remain intact. In any case, we do not base our holdings on his findings, for we have reviewed the record, and we are in complete agreement with his factual findings and his conclusion that these contract terms are unreasonably long."

Memorandum and Order of December 29, 1978, at 18, n.2.

The dispute over the viability of the pre-remand factual findings made by Justice Clark has not been carried to this appeal. Thus, it is not necessary for us to determine whether the pre-remand findings automatically survive under the circumstances of this litigation. Besides, Judge Peckham performed an independent review of the pre-remand record and noted his "complete agreement." Accordingly, for purposes of evaluating whether particular findings are clearly erroneous, the complete record—both pre- and post-remand—are available to us for evaluation. Finally, many of Justice Clark's factual findings involve Sportservice's concession contracts with major league baseball teams that remain as a significant number of Sportservice's aggregate share of the expanded relevant market. The continued relevancy of such findings is therefore obvious.

sion as it relates to Sportservice's conduct does not impose any general constraints upon the formation or enforcement of franchise agreements,[14] and it certainly does not establish that under all circumstances a concession franchise agreement with a term exceeding ten years is automatically a violation of the Sherman Act.

 Third, Sportservice takes issue with the district court's conclusion that almost no other concession contracts in the relevant market run for more than ten years. For this finding, Judge Peckham referenced two exhibits representing concession industry profiles that were admitted into evidence. These industrial surveys, assuming their accuracy, more than adequately support the conclusion that concession contracts for greater than ten years' duration are rare. Of those that do exceed ten years, the largest number are controlled by Sportservice. Sportservice asserts that the average contract length of various concession operations "in or near" the relevant market "substantially exceed 10 years." The record sources cited by Judge Peckham contradict this assertion, and without benefit of record sources for Sportservice's averages, we cannot find Judge Peckham's conclusion to be clearly erroneous.

 Finally, Sportservice contests Judge Peckham's rejection of Sportservice's explanation that clubs and sellers of concession franchises had actively sought long contract terms. Judge Peckham concluded that this proffered justification was without support in the record. Sportservice contends that the clubs and franchisors would often dictate the terms. To the contrary, the record shows that in many instances the long-term contracts were procured by Sportservice's cash payment loans or other financial inducements, and that without these financial inducements, the contract terms are comparatively short. Justice Clark also rejected this justification argument concerning Sportservice's baseball concessions and noted:

> "Where the Clubs seek enormous sums of money by way of advances, loans, et cetera, they know that such financial ar-

rangements require long terms. However, the record shows the Clubs do not want long terms. Absent the loans, advances, et cetera, all of the terms are comparatively short."

365 F.Supp. at 250. As mentioned, Judge Peckham was in complete agreement with Justice Clark's findings, and these findings relating to Sportservice's baseball concessions provided Judge Peckham with a legitimate source of evidence in which to assess Sportservice's conduct in the reassessed, post-remand market.

Having reviewed the record in regard to the challenged findings, we are not left with a definite and firm conviction that a mistake has been committed. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), and *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir. 1981).

### C. Attempted Monopoly, Sherman Act Section 2 Violation

 A section 2 attempt to monopolize claim requires proof of three elements: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir. 1981); *Portland Retail, etc. v. Kaiser Foundation, etc.*, 662 F.2d 641, 647 (9th Cir. 1981). In numerous cases, this court has noted that while the three elements are discrete, they are often interdependent; i.e., proof of one of the three elements may provide circumstantial evidence or permissible inferences of the other elements. For example, in *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978), we held that "proof of predatory or anticompetitive conduct which can serve as the basis for a substantial claim of restraint of trade will, in some circumstances, permit an inference of specific intent and then, in turn, of dan-

---

14. *See* section III.B.3.b. of this opinion, *supra*.

gerous probability." *Id.* at 854. Thus, an attempted monopoly violation can be found with evidence of conduct alone. Where this analysis is used, our most recent pronouncements indicate that all three elements may be proved with evidence of conduct that is either: (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary. *Inglis, supra,* 668 F.2d at 1029 n.11; *Portland Retail, supra,* 662 F.2d at 648.

The district court below found that the evidence proved not only a substantial restraint of trade (the section 1 violation), but also was clearly threatening to competition and clearly exclusionary. The district court elaborated:

> "Sportservice's use of excessively long contract terms in its purchases of concession rights has completely excluded competitors from those portions of commerce. This practice has established Sportservice as the leading power in this market, and, if enforced, it promises to preserve that impregnable competitive position for years to come. This conduct clearly supports an inference of a specific intent to destroy competition, and, in turn, an inference of a dangerous probability of success under *Janich Brothers.*"

Excerpt of Record at 80.

As further evidence of Sportservice's specific intent to monopolize, the district court's additional comments deserve repeating:

> "Sportservice's inclusion of follow-the-franchise clauses in its long-term contracts served to ensnare additional teams and facilities and so to multiply its concession franchise holdings. But perhaps the most blatant indication of Sportservice's intention is its repeated use of lav-

ish loans, advances, and cash payments specifically to secure long-term contracts and contract extensions. While such financial arrangements do not amount to independently illegal restraints, Sportservice's unabashed willingness to enter into and its frequent involvement in such cash-for-long-term-commitment deals is further evidence of its intent to monopolize."

Excerpt of Record at 81.

 Our review of the record finds sufficient evidence to support the district court's findings regarding Sportservice's conduct. We are therefore satisfied that Sportservice's conduct, as evidenced by this record, was sufficient for a conclusion that such conduct formed the basis for a substantial restraint of trade, was clearly exclusionary, and clearly threatening to competition in the relevant concession-franchise market. It was thus conduct sufficient in itself to provide proof of all three elements of a section 2 attempted monopoly violation, *Janich Brothers, supra; Inglis, supra.* We therefore affirm the district court's ruling that Sportservice violated section 2 of the Sherman Act, 15 U.S.C. § 2.

## IV. CROSS–APPEAL ISSUES

### A. *Post-Judgment Interest*

Judge Peckham awarded Finley damages in the amount of $282,168 (which was trebled) by adopting the same figure as calculated by Justice Clark in 1972.[15] *See* 365 F.Supp. at 255. Judge Peckham then granted interest on the damages commencing from the date of the entry of the post-remand judgment, July 31, 1979. Finley appeals from this interest award, maintaining that interest should run from the date of the first judgment, or, in the alternative, he seeks an inflation factor.[16]

---

**15.** These damages represent "the difference between what [Finley] would have received had there been no illegal restraints and what [Finley] actually received under the 1950 contract [with Sportservice]." *See,* 365 F.Supp. at 255. The damages are for the four-year period from 1964 to 1967.

**16.** Since we find for Finley on the interest issue, it is unnecessary to discuss Finley's argu-

ments regarding the application of inflation factors.

Finley also requests, in the alternative, that interest run at least from the date of the order establishing Sportservice's liability, December 29, 1978. Our decision, requiring interest to be calculated from the date of the entry of the first judgment, covers this requested period without reaching the merits of Finley's arguments that 28 U.S.C. § 1961 requires application of inter-

Finley argues that since the damages awarded in the 1972 and 1979 judgments are identical, post-judgment interest should be calculated from the date of the entry of the first judgment because the reversal of the first judgment was of no ultimate significance due to the subsequent entry of an identical post-remand judgment. Finley relies primarily upon *Mt. Hood Stages v. Greyhound Corp.*, 555 F.2d 687 (9th Cir. 1977) (*Mt. Hood I*); cert. denied in part, 434 U.S. 1008, 98 S.Ct. 716, 54 L.Ed.2d 750 (1978), *vacated and remanded on other grounds*, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978); *remanded to district court*, 583 F.2d 469 (9th Cir. 1978) (*Mt. Hood II*); 616 F.2d 394 (9th Cir.) (*Mt. Hood III*), cert. denied, 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980), where this court granted interest from the date of a judgment which had been vacated by the United States Supreme Court, but where the district court entered a post-remand judgment with identical damages figures.

Sportservice argues that we should view Judge Peckham's limited interest award as a correct exercise of discretion, reversible only if we find an abuse thereof. Sportservice also attempts to distinguish *Mt. Hood, supra*, arguing that interest in *Mt. Hood* was applied from the first judgment only because the plaintiff in that case had presented the prevailing theory to the district court "in the first place." This argument would have us view the instant case as different because the damages awarded in the second judgment in this case were granted on an "entirely different basis." Interest, Sportservice argues, can only accrue from the date of the second judgment as liability was not clearly established until then.

 As a preliminary matter, we recognize that an award of pre-judgment interest in a case under federal law is a matter left to the sound discretion of the trial court. *United States v. Cal. St. Bd. of Equalization*, 650 F.2d 1127 (9th Cir. 1981); *Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971).

However, our standard of review is not limited to deciding whether the district court abused its discretion in limiting the interest award because the issue before us here is whether mandatory post-judgment interest applied from the date of the first judgment is dictated by the application of 28 U.S.C. § 1961 to the facts of this case. Section 1961 provides in pertinent part:

"Interest shall be allowed on any money judgment in a civil case recovered in a district court . . . . Such interest shall be calculated from the date of the entry of the judgment, . . . ."

*Id.* In this case, the issue is whether the language "date of the entry of the judgment" means the first judgment entered by Justice Clark in 1972 or the post-remand judgment entered by Judge Peckham.

 Both parties make extensive references to *Mt. Hood*, both in support of and against Finley's request for interest to be applied to the date of the first judgment in this case, and the district court below carefully attempted to distinguish *Mt. Hood* from the instant case. Of the cases directed to this issue, we must agree that *Mt. Hood* is controlling. Our study of *Mt. Hood* forces us to agree with Finley that *Mt. Hood* requires reversal because we read it to be founded on 28 U.S.C. § 1961 and because the procedural contexts of this case and *Mt. Hood* do not significantly differ.[17]

As indicated by the lengthy citation above, *Mt. Hood* appeared before this court three times. The ultimate outcome in that case found Greyhound liable to Mt. Hood for treble damages from Greyhound's Sherman Act violations. The issue that precipitated the multiple appellate court record involved the interpretation of 15 U.S.C. § 15b, the four-year statute of limitations applicable to private antitrust actions. In support of its damages claims for the relevant period at issue, Mt. Hood originally argued that under 15 U.S.C. § 16(i), the statute of limitations had been tolled by the

est to periods between pronouncement of liability and entry of judgment.

17. The transactions which gave rise to Mt. Hood's claims against Greyhound are discussed at *Mt. Hood I, supra*, and are not relevant to our inquiry here.

United States' intervention in administrative proceedings initiated by Mt. Hood before the Interstate Commerce Commission ("Commission").[18] After the district court trial, but prior to the first appeal, Mt. Hood added an alternative theory—equitable tolling—for Mt. Hood's initiation of and participation in the Commission hearings. This theory was also advanced on appeal before this court and the United States Supreme Court.

In *Mt. Hood I*, this court affirmed the district court's decision that section 16(i) tolled the limitations period, but the Supreme Court reversed and vacated the judgment, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978), both appellate courts reserving judgment on the second theory of equitable tolling. Subsequent to the Supreme Court's vacation and remand to this court, we in turn remanded to the district court for additional findings regarding the equitable tolling theory, *Mt. Hood II, supra*. It was after this remand that the district court received new evidence and entered a judgment of damages in the same amount as it had entered earlier with liability based on the alternative theory. Greyhound appealed; we again affirmed, *Mt. Hood III, supra*; and the Supreme Court denied certiorari. 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980).

Although *Mt. Hood* did not involve a retrial of issues on remand, the district court did allow the parties to introduce new evidence supplementing the record on the equitable tolling issue. It was on the basis of the documents previously submitted after trial and this additional evidence that the district court ultimately determined the equitable tolling issue in Mt. Hood's favor. Greyhound's liability, thus, was not established until the second judgment was entered.

It can be seen, then, that the procedural transactions in the instant case mirror those which occurred in *Mt. Hood*. In both cases, the issue of antitrust liability was not firmly settled until the post-remand judgments, both of which were entered after additional factual inquiry. In both cases, it can be said that the second judgment "remains the same—in the same amount, for the same damages incurred during the same period." *Mt. Hood III, supra*, 616 F.2d at 407.

Judge Peckham concluded that "Mount Hood is best understood as a discretionary award of interest rather than a case espousing the principal [sic] of mandatory post-judgment interest." Excerpt of Record at 105–06.[19] We do not understand *Mt. Hood III* to involve a discretionary application of interest; we find the decision allowing interest from the date of the original vacated judgment to be based upon an application of the mandatory post-judgment interest as required under 28 U.S.C. § 1961.

We therefore vacate that portion of the district court's judgment which limited interest to a period starting from the date of the entry of the post-remand judgment, and

18. The Commission proceedings had been initiated pursuant to section 5(9) of the Interstate Commerce Act, 49 U.S.C. § 5(9), and involved issues with the same transactions involved in the antitrust litigation: *See Mt. Hood I*, 555 F.2d at 689 -90.

19. In fairness to Judge Peckham, it is not clear from his March 31, 1980 Memorandum and Order whether he had the benefit of this court's most recent pronouncement in *Mt. Hood III, supra*, where this court discussed the interest issue in light of 28 U.S.C. § 1961. *See* 616 F.2d 406 07.

Our decision here would be no less compelled if *Mt. Hood* were read in the manner suggested by Judge Peckham because the equities attaching to Finley and Mt. Hood are similar. Judge Peckham's limited interest award emphasized the fact that Finley was responsible for the delay in obtaining its second judgment from its actions in asserting what was determined to be an erroneous relevant market. Even if we could accept that responsibility for delay is a proper standard for district courts to use in granting or denying post-judgment interest (and we decline to do so here), appellant in *Mt. Hood* bore the same responsibility for asserting an erroneous position on appeal. The appellant in *Mt. Hood* did raise the prevailing theory after trial and in the appellate courts, but also vigorously asserted on appeal what was determined by the Supreme Court to be an erroneous theory. We see no significant differences between this case and *Mt. Hood* that would counsel us not to follow its precedent of granting post-judgment interest to the prevailing party commencing on the date of the first judgment.

remand with instructions to recalculate the appropriate amount of post-judgment interest consistent with this opinion.

### B. *Attorney's Fees*

Finley does not contest Judge Peckham's award of attorney's fees of $249,957.13 and costs of $5,833.57 for the post-remand period from June 26, 1975 through April 11, 1979. As unchallenged, these fees stand.

Finley does contest Judge Peckham's limitation of fees for the first trial, post-trial and appellate work. For the time spent by Finley's counsel for the period extending from the inception of this litigation through September 16, 1972, Justice Clark awarded a total of $257,182.30 in fees and costs. After the remand, Judge Peckham, feeling compelled to limit the first trial fee award since it related to time spent asserting an incorrect relevant market, reduced that fee in half and awarded $128,591.15. Judge Peckham then determined that a reasonable fee for post-trial time spent by Finley's counsel finalizing the first judgment and applying for attorney's fees was $6,780.00, but again reduced that award in half to $3,390.00 for the same reasons. As for the first appeal, Judge Peckham found a reasonable fee in the amount of $42,687.50, but awarded only ten percent, or $4,268.75, because Finley prevailed only on a statute of limitations question, suffering the reversal on all other questions. Finley feels entitled to all reasonable fees for the relevant time periods, arguing that all time spent was undertaken reasonably in an effort to obtain a successful recovery of antitrust damages. We agree with Finley.

█ Section 4 of the Clayton Act, 15 U.S.C. § 15, allows a successful treble damage plaintiff to recover reasonable attorney's fees as costs. An award of attorney's fees as part of the cost of a successful antitrust suit is mandatory, *Baughman v. Cooper-Jarrett, Inc.*, 530 F.2d 529 (3d Cir.), *cert. denied*, 429 U.S. 825, 97 S.Ct. 78, 50 L.Ed.2d 87 (1976), and the purpose of the attorney's fees provision is to insulate treble damage recovery from expenditures for legal fees, consistent with section 4's purpose to encourage private persons to undertake enforcement of antitrust laws. *Per-*

*kins v. Standard Oil Co.*, 474 F.2d 549 (9th Cir. 1973), *cert. denied*, 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400, *amended on other grounds*, 9th Cir. 487 F.2d 672.

█ The amount of attorney's fees allowed in connection with an award of damages in an antitrust suit is within the discretion of the trial court, reasonably exercised, and will not be disturbed absent an abuse of discretion or clear error of law. *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964). For the reasons expressed below, we conclude that Judge Peckham erred in his application of the case law in denying Finley attorney's fees for all work reasonably performed in pursuit of a successful recovery of antitrust damages.

Judge Peckham reduced the fee award because he was "of the opinion that time spent in the pursuit of unsuccessful claims should not be compensated as part of Finley's reasonable attorneys' fees in this matter," citing *Wall Products Co. v. National Gypsum Co.*, 367 F.Supp. 972 (N.D.Cal. 1973). Sportservice supports Judge Peckham's limitation citing to additional authority for the proposition that time spent prosecuting unsuccessful claims should not be considered in awarding attorney's fees under section 4 of the Clayton Act. For this proposition, Sportservice cites *FLM Collision Parts, Inc. v. Ford Motor Co.*, 411 F.Supp. 627 *modified on other grounds*, 543 F.2d 1019 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Vandervelde v. Put & Call Brokers & Dealers Association*, 344 F.Supp. 157 (S.D.N.Y.1972); *Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054 (S.D.N.Y. 1977), *aff'd*, 578 F.2d 1368 (2d Cir. 1978); *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208 (3d Cir. 1978); and *Beech Cinema v. Twentieth Century Fox Film Corp.*, 480 F.Supp. 1195 (S.D.N.Y.1979), *aff'd*, 2nd Cir. 622 F.2d 1106 (1980).

We think Sportservice and the district court below have misread the above cases. Our reading of the above-cited authority reveals that the cases are descendants of

*Decorative Stone Co. v. Building Trades Council*, 23 F.2d 426 (2d Cir.), *cert. denied*, 277 U.S. 594, 48 S.Ct. 530, 72 L.Ed. 1005 (1928), a case in which a prevailing antitrust plaintiff, who had received damages and an injunction against the defendant, requested attorney's fees, and was denied fees for work attributed to the equitable relief because "[t]he allowance of an attorney's fee, as authorized by section 4 [of the Clayton Act], is incidental to the statutory right to damages, and was properly denied in the equity proceedings."

*Decorative Stone, supra,* 23 F.2d at 428. The rule originating from *Decorative Stone* has been applied to deny fees to plaintiffs who asserted "factually unsupportable claims," *Vandervelde, supra,* 344 F.Supp. at 161, and *Wall Products Co. v. National Gypsum Co.,* 367 F.Supp. 972 (N.D.Cal.1973); and to deny fees related to work that was duplicative or related solely to claims or activities unrelated to the successful recovery of antitrust damages. *See FLM, supra,* and *Kane, supra.*

A closer look into the rule's historical underpinnings and the later cases reveals the district court's error. The cases clearly state that although "[t]ime devoted exclusively to prosecuting unsuccessful claims is not compensable," *Beech Cinema v. Twentieth Century Fox Film Corp.,* 480 F.Supp. 1195, 1197 (S.D.N.Y.1979), *aff'd,* 622 F.2d 1106 (2d Cir. 1980) (citing *Kane, supra,* and *FLM, supra*), the cases also add that "to the extent that the time was applicable to both successful and unsuccessful claims, it is properly includible." *Id.*

■ In the present case, Judge Peckham reduced Finley's fees by one-half for time spent prosecuting the first trial, and denied all but 10 percent of Finley's fees for time spent prosecuting the first appeal, stating that the reduction was justified because "time spent in the pursuit of . . . unsuccessful claims should not be compensated." Characterizing Finley's prosecution of the first trial and first appeal as an assertion of unsuccessful claims proves too much. As we understand the rule generated from *Decorative Stone* and more recently applied in *Beech Cinema,* a plaintiff is to receive compensation in fees for work which is re-

lated to the pursuit of both successful and unsuccessful antitrust claims. In the instant case, Judge Peckham concentrated on Finley's unsuccessful efforts in persuading this court to affirm its success at the first trial. Our review of the record finds no evidence that Finley's time was devoted exclusively to the promotion of unsuccessful claims. That Finley asserted what was deemed to be an erroneous relevant market and two antitrust theories that were rejected on appeal does not mean that Finley's attorney's work product was devoted to duplicative efforts or to the pursuit of damages not properly compensable under section 4 of the Clayton Act. As we view this case, all of Finley's efforts in pursuit of antitrust damages against Sportservice were properly pursued toward the successful recovery of a single claim for relief; i.e., damages for Sportservice's anticompetitive conduct. Finley obtained relief for its injuries by prevailing under the theories we affirm in this opinion. At no time did Finley request relief other than that for which it now can claim a damages judgment.

■ Moreover, we believe that a prevailing antitrust plaintiff is entitled to recover a reasonable attorney's fee for every item of service which, at the time rendered, would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest in the pursuit of a successful recovery of anti-trust damages. *See Pitchford Scientific Inst. Corp. v. Pepi, Inc.,* 440 F.Supp. 1175 (W.D.Pa.1977), *aff'd,* 582 F.2d 1275 (3d Cir. 1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 242 (1979).

The fees granted by Justice Clark for Finley's work during the first trial were adjudged reasonable by Justice Clark at that time. The parties, in effect, stipulated, and Judge Peckham apparently agreed, that the dollar figures arrived at by Justice Clark for the time spent on the first trial were reasonable. However, Judge Peckham, in an admittedly crude manner, reduced the fee award granted by Justice Clark in half because of Finley's unsuccess-

ful assertion of a narrow relevant market. Judge Peckham did not suggest that Finley's advocacy was other than what a reasonable and prudent attorney would perform in advancing or protecting his client's interest in the successful pursuit of antitrust damages. Thus, to the extent Judge Peckham reduced Finley's attorney's fee awards otherwise adjudged to be reasonable, he erred in his application of relevant case law.

We do not think that *Bartholomew v. Watson,* 665 F.2d 910 (9th Cir. 1982), is contrary. In that case, a panel of this court followed *Sethy v. Alameda Cty. Water Dist.,* 602 F.2d 894 (9th Cir. 1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 731, and held that although Oregon state inmate plaintiffs were only partially successful in obtaining the relief they sought from the defendants' administration of the Oregon correctional facilities, they still could be considered as prevailing parties for purposes of applying 42 U.S.C. § 1988. *Citing Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir. 1978) (*Nadeau II*), this court in *Bartholomew* stated:

> "[p]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit. However, the amount of attorney's fees they receive should be based on the work performed on the issues in which they were successful."

665 F.2d at 914. The *Bartholomew* court then remanded the attorney's fee issue for a determination "of the amount of time spent by [plaintiffs'] counsel on the prevailing issues." *Id.* at 915. *Bartholomew* could be read to support Judge Peckham's limitation of attorney's fees in the instant case as he considered the relevant market issue, as litigated by Finley at the first trial and rejected on first appeal, to be an unsuccessfully asserted issue. July 23, 1979 Memorandum and Order at 7, ER at 91–92. However, for the reasons expressed below, we do not believe that *Bartholomew* is applicable to the instant case.

 First, there should not be automatic transference of rulings interpreting 42 U.S.C. § 1988 to cases involving the application of the attorney's fees provision under 15 U.S.C. § 15. While the statutes promote similar policies and purposes, *cf. Seattle School Dist. No. 1 v. State of Wash.,* 633 F.2d 1338 (9th Cir. 1980), *probable jurisdiction noted,* —— U.S. ——, 102 S.Ct. 384, 70 L.Ed.2d 204 (1981) (purpose in providing attorney's fees in civil rights cases was to eliminate financial barriers to the vindication of constitutional rights and to stimulate voluntary compliance with the law) with *Perkins v. Standard Oil Co., supra,* (purpose of attorney's fees provision of section 4 of the Clayton Act, 15 U.S.C. § 15, is to award the successful plaintiff a reasonable attorney's fee so that his treble damage recovery would not be unduly diminished by the payment to his attorneys and further encourage antitrust law enforcement), the two statutes vary in scope. Section 1988 provides for recovery of attorney's fees for section 1988 plaintiffs who may claim damages or who may claim declaratory and injunctive relief. Section 4 of the Clayton Act, 15 U.S.C. § 15, on the other hand, is more limited; attorney's fees under § 15 are incidental to the statutory right to damages and are properly denied in equity proceedings. *Decorative Stone, supra.* This incidence or relationship to antitrust damages recovered also solves the problem of determining who is the prevailing party in an antitrust treble damages suit.

Second, and perhaps more importantly, *Bartholomew* followed the prevailing issues rule as stated in *Sethy, supra,* and *Sethy* followed the rule as initially announced by the First Circuit in *Nadeau II, supra.* The critical word in the *Nadeau* prevailing issues rule is "issues." By taking a closer look at the factual circumstances of the *Bartholomew, Sethy* and *Nadeau* cases, it becomes apparent that the courts in those cases used the word "issues" more in the sense of "claims for relief" rather than broadly intending the prevailing issues rule to preclude attorney's fees recovery for work spent on every unsuccessfully asserted factual or legal issue arising in a case.

In *Nadeau,* the plaintiff inmates claimed that a number of restrictions placed upon

them under protective custody at the New Hampshire State Prison Annex violated the First, Sixth, Eighth and Fourteenth Amendments. *Nadeau v. Helgemoe*, 423 F.Supp. 1250, 1260 (D.N.H.1976). The district court ordered relief in many forms such as added safety precautions for the transportation of protective custody inmates; improved living conditions; improved mealtime conditions; increased access to shower, exercise facilities, and library, etc. *Id.* at 1274–75. On appeal, the First Circuit reversed all of the district court order save the portion ordering increased access to library facilities. *Nadeau v. Helgemoe*, 561 F.2d 411 (1st Cir. 1977) (*Nadeau I*); (*see also* confirmation of the result after the first appeal in *Nadeau v. Helgemoe*, 581 F.2d 275 (1st Cir. 1978) (*Nadeau II*). The above-quoted rule regarding attorney's fees was announced in *Nadeau II*, 581 F.2d at 278–79; and that court applied it as to the prevailing library access issue as follows:

"We think it is clear that the library access *issue* was significant enough a victory for plaintiffs to be considered prevailing parties. For their work on that *issue* they 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'"

*Id.* (Citations omitted, emphasis added).

While the court in *Nadeau II* referred to the library access "issue" in the above quote, it is apparent that the reference is to a successfully asserted claim for relief—increased library access. The plaintiff inmates prevailed on the library access claim, receiving the only relief sought as to that claim—an injunction granting greater access to the prison's library facilities. The prevailing "issue," then, in *Nadeau* was not an issue of disputed facts, nor of disputed evidentiary rulings, nor even of disputed legal theories. The prevailing "issue" was a successfully litigated claim for injunctive relief. Had the claim for increased library access been the only claim brought by the inmates, there would have been no question that the inmates were prevailing parties within the meaning of 42 U.S.C. § 1988.

A similar reading emerges from a look at the *Bartholomew* case. The prevailing issue rule as applied in *Bartholomew* can also be read to mean that under 42 U.S.C. § 1988, a plaintiff who prevails on some claims for relief may collect an attorney's fee award for work spent on litigation of those successful claims. Although, as in *Nadeau*, the word "issues" is used in *Bartholomew* instead of "claim for relief," the factual circumstances in *Bartholomew* are sufficiently similar to those in *Nadeau* to indicate that the rule should apply to exclude fees only for work performed on unsuccessfully asserted claims for relief. Reviewing the district court opinion in *Bartholomew*, it is clear that the prisoners sought separate declaratory and injunctive relief from a number of separately alleged constitutional violations resulting from factually distinct actions of the defendants. *See Bartholomew v. Reed*, 477 F.Supp. 223 (D.Or. 1979). The plaintiff inmates ultimately prevailed on only four claims. *Id.* at 233. Although this court in *Bartholomew v. Watson* noted that the "State inmates argue quite persuasively that only one constitutional challenge was presented in the complaint, . . . ," 665 F.2d 914–915, the court did not so hold; and, apart from any determination as to the number of "challenges" brought, we do not think it reasonable to view *Bartholomew* as involving only one claim for relief. Approximately eleven separate claims for relief were requested in *Bartholomew*, the plaintiffs prevailing on four.

*Sethy, supra,* is consistent with the above interpretation of the word "issues." In *Sethy*, this court first adopted the *Nadeau* rule in a case in which a prevailing plaintiff was only partially successful. While bringing claims against a public water district and a number of individual defendants under both 42 U.S.C. §§ 1981 and 1983, Sethy received a jury verdict as against the water district only and only on the § 1981 claim. This court considered the § 1981 claim against the water district to be "one of the most significant *issues* in litigation," 602 F.2d at 898, yet it is apparent from the facts of the case that the reference to the significant issue is a reference to Sethy's claim for relief against the water district under § 1981.

█ *Bartholomew, Sethy*, and *Nadeau* apply to partially successful § 1983 plaintiffs. As an antitrust treble damages plaintiff, Finley has always sought only one claim for relief—damages for antitrust violations. Finley is not a partially successful plaintiff. Although once unsuccessful on the relevant market issue, and ultimately on the asserted theories of monopoly and tying, Finley's successful recovery of antitrust damages indicates that Finley was totally successful on the only claim for relief he ever sought.

We simply cannot read the word "issues" in *Bartholomew* and *Sethy* so literally to mean that a successful treble damages plaintiff is to be denied attorney's fees for time spent on all unsuccessfully litigated issues. To do so would mean that the district court would be required to exclude time devoted to unsuccessfully asserted evidentiary issues, to unsuccessfully asserted versions of disputed facts, and to other seemingly innumerable types of factual or legal issues which a prevailing plaintiff may lose in the course of a successfully litigated damages award. It may be that in the context of § 1983 litigation involving constitutional challenges to prison confinement conditions, that the word "issues" is particularly relevant for purposes of applying § 1988; it could also be that the original choice of the word in *Nadeau* was an unfortunate one. Be that as it may, a literal application of the prevailing issues rule in the context of applying section 4 of the Clayton Act would lead to absurd results; results that, in our mind, would also lead to an incorrect application of the philosophy of full recovery of attorney's fees for successful treble damages plaintiffs.

As mentioned, for purposes of applying the attorney's fees provision of section 4 of the Clayton Act, 15 U.S.C. § 15, time devoted to a request for injunctive relief may be excluded, *Decorative Stone, supra* ; time exclusively devoted to factually unsupportable claims may be excluded, *Vandervelde, supra*, and *Wall Products, supra* ; and time devoted to work which is duplicative or related solely to claims or activities unrelated to the successful recovery of antitrust damages may be excluded. *FLM, supra*,

and *Kane, supra*. Judge Peckham found none of the above. Instead, he focused upon the time consumed in the instant litigation relating to the reversal of Finley's first asserted relevant market. Certainly, the relevant market was a critical issue in this case, and it cannot be disputed that Finley lost round one on that issue. But, we have found no cases, including *Bartholomew v. Watson*, which would support a limitation upon Finley's attorney's fee award in the circumstances of this case, and we feel it is inadvisable to create such a rule here.

█ We believe that in order to advance the purpose of the attorney's fees provision of section 4 of the Clayton Act, Finley is entitled to all reasonable fees generated at every stage of this litigation: first trial, appeal, and post-remand work. To deny Finley reasonable attorney's fees for time spent at all these stages would discourage private plaintiffs from vigorously prosecuting antitrust claims. Accordingly, the district court's award of attorney's fees is vacated and we remand with instructions for the district court to enter an award of attorney's fees and costs in the following manner:

(1) For the period from the initiation of the litigation through September 16, 1972, fees and costs in an amount of $257,182.30 (original figure as determined by Justice Clark);

(2) From September 17, 1972 through April 4, 1973 (time spent finalizing the first judgment and applying for attorney's fees), an amount of $6,780.00 (Judge Peckham's determination of a reasonable fee without reduction);

(3) For time spent on prior appeal for the period from May 16, 1973 through February 27, 1975, an amount of $42,-687.50 (determined to be reasonable by Judge Peckham per the July 23, 1979 Memorandum and Order);

(4) For the period from June 26, 1975 through April 11, 1979, an amount of $249,957.13 and costs in the amount of $5,833.57.

Interest shall be applied to the above figures from the date of the entry of the judgment in which each fee award was entered pursuant to the dictates of section IV.A. of this opinion.

Costs on appeal are awarded to Finley. On the remand, the district court shall entertain a motion by Finley to fix attorney's fees on this appeal and shall conduct such proceedings as may be necessary to make a reasonable award.

## V. CONCLUSION

We affirm the district court's determinations that Sportservice violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. We reverse the district court's limitations of interest and attorney's fees.

AFFIRMED in part; REVERSED and REMANDED in part.